710 P.2d 10

**Robin J. LePAGE, Petitioner-Appellant,**

v.

**STATE of Idaho, Defendant-Respondent.**

No. 15154.

Court of Appeals of Idaho.

Oct. 16, 1985.

Rehearing Denied Dec. 31, 1985.

John C. Lynn, of Lynn, Scott & Hackney, Boise, for petitioner-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for defendant-respondent.

Special Panel: BISTLINE, Acting C.J., and McFADDEN and OLIVER, Acting JJ.

McFADDEN, Acting Judge.

■ This case involves appellant's post-conviction relief proceedings. Appellant's conviction on charges of first degree murder and use of a firearm during its commission was upheld by the Supreme Court in *State v. Le Page*, 102 Idaho 387, 630 P.2d 674 (1981), *cert. den.* 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981). Subsequently, on February 8, 1982, appellant filed a petition for post-conviction relief asserting that he was denied effective assistance of counsel at trial. His petition was amended twice and on January 7, 1983, the petition in its final form alleged that appellant had been denied effective assistance of counsel and that a state witness, Charles Ray Thompson, was induced by the State to perjuriously testify against the appellant. In response to an order by the district court to specify the grounds on which appellant relied, the appellant also submitted a 17-page memorandum detailing potential inadequacies of the trial counsel which might be uncovered by an evidentiary hearing. In the meantime, the State moved to dismiss each petition pursuant to I.C. § 19–4906. That section provides in pertinent part:

> "(c) The court may grant a motion by either party for summary disposition of the application when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

The State contended that those issues raised by appellant were barred by the doctrine of res judicata because they were

decided on direct appeal. On June 9, 1983, the district court held a hearing to determine if there were any genuine issues of material fact regarding appellant's claims. Subsequently, on June 27, 1983, the district court granted the State's motion to dismiss. The district court held that those ineffective assistance claims raised on direct appeal were barred by res judicata and further found that no material issue of fact existed with respect to appellant's other claims that would entitle appellant to relief.

We have reviewed the complete record and affirm the district court's decision for the reasons aptly stated in that decision.

OLIVER, Acting J., concurs.

BISTLINE, Acting Chief Judge, dissenting.

At the outset an important observation to make is that this appeal should have been retained by the Supreme Court. Not only would judicial economy have been better served with appellate review by a court already acquainted with the case, but the question involved is important. The question, *res judicata* effect *and scope* of a supreme court holding of harmless constitutional error, is one which the Supreme Court has not satisfactorily clarified. Ten years ago Justice Bakes wrote:

> The question of competency of counsel is an extremely complex factual determination which, in all but the most unusual case, requires an evidentiary hearing for determination. *See State v. Tucker,* 97 Idaho 4, 539 P.2d 556 (1975). The resolution of those factual issues for the first time upon appeal, based upon a trial record in which competency of counsel was not at issue, is at best conjectural. *State v. Kraft,* 96 Idaho 901, 906, 539 P.2d 254, 259 (1975).

It is true that in this case the attorney who represented LePage at trial was unaware of the *Massiah* rule and it now appears also was unaware of the violation of that rule until after trial, and did not move against evidence offered in violation of that rule. It is also true that on appeal the *same* attorney, having in the meantime be-

come enlightened as to the rule and as to what had taken place, assigned as error his own incompetency in that regard as an issue on the appeal. *State v. LePage,* 102 Idaho 387, 391, 630 P.2d 674, 678 (1981). There, following the precepts of *United States v. Henry,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Idaho Supreme Court noted that:

> It is clear here that the government deliberately placed the informant next to LePage for the purpose of eliciting evidence to be used against LePage. Second, LePage was unaware that the informant was a tool of the state; the informant was "ostensibly no more than a fellow inmate. . . ." Finally, LePage was not only in custody and under indictment at the time that he was engaged in conversation by the informant; he had been arraigned, had been given his preliminary hearing, had been given a court-appointed attorney and had been in jail for approximately five months. LePage was neither informed that the person to whom he was speaking was an agent for the state nor given the opportunity to contact his attorney prior to the conversation. *LePage,* 102 Idaho at 392, 630 P.2d at 679.

Earlier in that opinion the Court had already disagreed with the attorney general's contention that "the statements which Thompson overheard were made voluntarily, were reliable, and therefore their admission did not affect the factual accuracy of the verdict." *Id.,* at 390, 630 P.2d at 677. It observed that "The statements were made after having been incarcerated for some five months and during conversations with, if not interrogations by, an informant whose job it was to elicit such statements." *Id.,* at 391, 630 P.2d at 678.

It then turned to the attorney general's claim that the surreptitious interrogation was harmless error, and immediately cited *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). But it did not apply *Chapman.*

In a separate opinion in *State v. Hodges,* 105 Idaho 588, 671 P.2d 1051 (1983), I ex-

plained that what happened in *LePage* was an abrupt departure from our previous reliance on *Chapman;* instead we turned to *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), commenting as follows:

> "We have today more squarely faced the question than did the Supreme Court majority in that case by outright conceding that the improper testimony supplied by unconstitutionally planting an officer in the cell adjacent to LePage's *did* contribute to the verdict, but we have nevertheless applied the *Chapman* 'harmless error rule' just as the Supreme Court did in *Wainwright, on the basis of overwhelming and conclusive evidence."* 102 Idaho at 396, n. 8, 630 P.2d at 683, n. 8 (emphasis added). *Hodges, supra,* 105 Idaho at 595, 671 P.2d at 1058 (emphasis original).

A few passages later I suggested that "What the Supreme Court might have done with our *LePage* case is an interesting speculation," and observed in a footnote that:

> As the *LePage* file in the clerk's office shows, following the appeal of his conviction, LePage, without counsel and indigent, endeavored to petition the Supreme Court for certiorari. By the time this Court caused counsel to be appointed, his allotted time had expired. Nevertheless, appointed counsel did so petition, but the petition was denied without comment leaving unknown whether untimeliness was the reason. *Hodges, supra,* 105 Idaho at 596, n. 1, 671 P.2d 1058, n. 1.

A case much later than *Milton* was *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). There the Court made the review of its harmless error doctrine, the exact review that *LePage* would have engendered had the petition for certiorari not been untimely filed. In analyzing the opinions in *Connecticut v. Johnson,* I observed that "First of all it is to be noted that the Court retrenches to *Chap-*

*man* and takes the view that *Chapman* merely continued a trend away from the practice of reversing 'for the most *trivial* of errors.'" *Hodges, supra,* 105 Idaho at 597, 671 P.2d at 1059 (emphasis added).[1]

## II.

Not only is the *LePage* opinion suspect by application of an unsatisfactory standard in examining for harmless constitutional error, but the petition for post-conviction relief goes beyond a request for reexamination of the *Massiah* violation which was conducted by the Idaho Supreme Court.

Before any hearing took place in post-conviction proceedings, the trial court entered an order for specificity of grounds. A response to said order was filed by Petitioner on January 12, 1983, highlighting in detail several specific issues of incompetency regarding the preparation and presentation of the case by trial counsel (see Clerk's Record herein). In conjunction with said Response, an Affidavit of Michael K. Ferrin, trial counsel, indicated that on numerous occasions he requested investigative assistance but that such requests were denied. Mr. Ferrin further deposed that an investigator would have greatly assisted in the preparation of the case. Also, an Affidavit of Charles Ray Thompson, was submitted. He indicated that his testimony against LePage was a fabrication and the product of certain promises which were previously undisclosed. Consequently, a Second Amended Petition for Post-Conviction Relief was filed January 12, 1982, incorporating the previous grounds and additionally asserting:

> 8. That there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice; to wit (1) a witness for the State, Charles Ray Thompson, falsely testified against Petitioner,

---

1. I do not strongly urge that this Court can undo what the Supreme Court did. I do urge that we should at the least have in mind exactly what was decided before summarily affirming the trial court on this appeal.

Robin LePage, at his trial, and (2) agents of the State unfairly induced Charles Ray Thompson to testify against Petitioner in violation of constitutional due process of law ...

Additional affidavits were filed with respect to Thompson's statements in his affidavit. The State again moved to dismiss on *res judicata* grounds and the case eventually came to a hearing on June 9, 1983. There was some confusion as to the purpose of the hearing as reflected in the transcript thereof, however, it was finally understood that the court, Judge George, would rule upon the pending Motion to Dismiss, and if necessary, reset the case for a further evidentiary hearing. The trial judge, the Honorable Arnold T. Beebe, testified that he did not recall Mr. Ferrin's request for investigative help in direct contravention to matters asserted by Mr. Ferrin in his affidavit.

The lower court's Order of Dismissal was filed on June 27, 1983. Appellant's Brief, pp. 3–4.

Counsel for LePage on this appeal concedes the applicability of the doctrine of *res judicata,* but contends that doctrine does not apply to issues which were not raised on the direct appeal:

The thrust of the Petition here is the assertion that trial counsel failed to adequately prepare the case factually and present the case legally *in addition to* the problems reflected over the "Massiah" statements. Furthermore Petitioner in paragraph 8 of the Petition, as amended, has alleged exceedingly important due process issues totally outside of the trial record and having nothing to do with the competency issues raised in paragraph 7. The lower court doesn't even mention these problems which suggest LePage was denied a fair trial by unlawful State action in dealing with witness Thompson. (See Clerk's Record— Affidavit of Charles Ray Thompson). Please note that the claim of bad-faith prosecution here in post-conviction proceedings is perhaps best evidenced by the "Massiah" statements found by this

Court to be so harmless. The authorities deliberately placed a plant in LePage's cell just before trial to extract admissions in direct violation of established constitutional principles. Now there is evidence that Thompson perjured himself through inducement by government agents.

At the risk of sounding too elementary, the Petitioner submits that serious legal issues, not heretofore raised on direct appeal, have been raised by the Petition herein which have not been previously adjudicated. The failure of trial counsel to suppress, object and impeach are but a part of the greater issue of general incompetency; also no issue on direct appeal raised the newly-discovered issues of bad-faith prosecution discussed above. Furthermore, clearly there is a material issue of fact on the adequacy of investigation which has not been resolved by an evidentiary hearing. Judge Beebe testified that he did not recall trial counsel, Mr. Ferrin, requesting investigative help. This is squarely at odds with Mr. Ferrin's Affidavit indicating he did. What can be more of material issue of fact! Appellant's Brief, pp. 6–7.

However, the fact remains that LePage has not had a full hearing on all of his claims of incompetency, as well as, the allegations of misconduct by the State over the use of witness Thompson.

In short, the case should be remanded for an evidentiary hearing on all the issues presented to the lower court. Appellant's Brief, p. 12.

Although this appeal should have been retained by the Supreme Court, where it was not and this court has it, we should either discuss the issues raised of which we can make disposition, or request the Supreme Court to revoke the assignment to this under court. I.A.R. 114. I believe that this court may be working an injustice upon petitioner by baldly stating that "We have reviewed the complete record and affirm the district court's decision for the reasons stated in that decision." Although the district court opinion on ordering a

dismissal accurately observed the effect of the Supreme Court decision on the direct appeal, and did discuss and rule on the claimed denial of investigative aid, and did take live testimony from the district judge who had presided at LePage's trial, and did rule that there had been a failure on the part of counsel to file a formal request for such aid, the trial court *did not* directly pass upon the conflict between counsel's affidavit and the district judge's recollection. The trial court also did not pass upon the independent issue of claimed perjury on the part of state's witness, Charles Ray Thompson. Inherent in the trial court's opinion is also the concession of a failure on the part of trial counsel to preserve the record on the matter of investigative aid. It would be better that the opinion of this court deal openly with those issues, because otherwise the Idaho Supreme Court on a reading of this court's opinion may deny further review as being a waste of judicial resources.

Primarily, I believe the matter of claimed perjury is extremely important. Thompson was *the* witness [2] who came before the jury and related the statements which he claimed to have heard being made by Le-Page to the informant wrongfully placed there by the state to elicit statements.

Another factor which now comes to light is that there does not appear to have been any incompetence of counsel regarding the *Massiah* violation. On examination of the judge who had presided at trial:

Q. Did you at all feel, Judge, during the course of the trial (and I believe you are the only one here that has the benefit of that experience) did you at all feel that Mr. Ferrin could very well have used investigative help on some critical aspects of the facts?

A. No recollection of any conscious thought in that regard. He seemed to know what he was doing.

Q. When he did not move to suppress or object to the Massiah statements that are addressed on appeal, did you feel

that at that point in the trial that he, as you say, "knew what he was doing"?

A. Well, I think, if you check the record, *I didn't know at the time it came in that it was a Massiah violation.* I think you'll find that in the record, so I couldn't have worried about Mr. Ferrin. I could be wrong in my recollection. I didn't know it was a Massiah violation when it came in. I think it was only put on a motion or later on that it came to my attention. Then I might have had some thoughts, "Why not? Why didn't you do this?" Yes. Tr., pp. 21–22.

Harmless error, as applied by the Supreme Court in LePage's direct appeal, regarding the *Massiah* violation, is one thing. But it is entirely another thing if a conviction is based on perjured testimony of a state's witness—especially a witness who was in jail and certainly somewhat at the mercy of those who might be inclined to misuse him. I do not understand how Thompson's affidavit can be so easily ignored—either in the trial court or in this court, for which reason it is appended, as well as pertinent portions of his testimony given at LePage's trial.

If Thompson's sworn affidavit is to be believed, there was no violation of the *Massiah* rule—this simply because the state's informant did not hear LePage make any incriminating statements, whether or not elicited by the informant. The informant has not testified for the state, either at LePage's trial or in this post-conviction proceeding. At LePage's trial he was simply referred to as "J.W." Unless he, too, was a convicted felon, he logically was the witness who should have testified on behalf of the state.

### ATTACHMENT A

### AFFIDAVIT OF CHARLES RAY THOMPSON

CHARLES RAY THOMPSON, being first duly sworn upon his oath, deposes and says:

---

2. Thompson was not in jail on any trivial misdemeanor charge.

1. That I am a convicted felon serving fixed sentences at the Idaho State Correctional Institute for robbery and use of a firearm during the commission of a felony, and sign this affidavit in order to truthfully disclose information relevant to the Petition for Post Conviction Relief filed by Robin LePage;

2. That on or about February 9, 1978, affiant was called by the State of Idaho as a witness at trial against Robin LePage, the defendant facing a charge of Murder in the First Degree;

3. That as a witness in the trial therein, I testified Robin LePage made certain statements to a parole informant named J.W. on or about January 23, 1978, in the Blackfoot Jail;

4. That affiant, in fact, never overheard Robin LePage make any statements and testified falsely in that manner only to further my own gain on pending charges which affiant was facing at the time of said testimony;

5. That affiant's testimony at said trial was solely the product of information supplied by the informant, J.W., and John Messinese who were each housed in the cell next to mine;

6. That although affiant was not promised any specific benefits from testimony against Robin LePage, I was given certain commissary and meal privileges and was lead to believe by Detective Boyd Summers during a number of discussions that he would "help me", and therefore, I expected probation on my own charges in exchange for my "testimony";

7. That affiant was coached extensively by Detective Summers on what to say and how to say it, for example, I was told to tell the jury that I was afraid of Robin LePage, when in fact, I was not;

8. That at all times while incarcerated with Robin LePage, he never made any admissions or statements to me about the alleged murder except that he did not do it.

s/Charles Ray Thompson
CHARLES RAY THOMPSON

SUBSCRIBED and SWORN to before me this 16th day of December, 1982.

s/ Wayne L. Weirum
Notary Public for Idaho
Residing at Boise, Idaho

## ATTACHMENT B

### DIRECT EXAMINATION

### OF

### CHARLES RAY THOMPSON

Q. When they came back—when you were back in jail a second time, do you recall any conversations that were unusual that would relate to this case?

A. Yes.

Q. What do you recall, please? First of all, who was present?

A. Me and J.W. and Robin.

Q. Okay. Where were you?

A. I was in Cell No. 3.

Q. Where was this J.W.?

A. Cell no. 4.

Q. Where was Robin?

A. Cell No. 5.

Q. These are connecting cells, then?

A. Yes.

Q. Can you see from one side of the jail into the next cell?

A. No.

Q. And describe the jail cell that you are talking about, please.

A. Well, all the jail cells are on one side. They're right next to each other. Here's one and here's one and here's one (indicating). So they're all on the same side. There's no way you can look into the other cell.

Q. Is there a common walkway in front of it?

A. Yes.

Q. When did this conversation, if you can recall, take place?

A. Time or day?

Q. What day and time?

A. It was on a Tuesday, I think, and it was the 24th, and the conversation lasted a long time. It started about 3:30, 4:00, and it was still going on about 10:00, 11:00.

Q. Were you involved in this conversation?

A. I said a few things.

Q. Mostly who was the conversation between, then?

A. Robin and J.W.

Q. To the best of your memory, please, tell the jury what you heard.

A. Heard him talking about washing a truck.

Q. Who said something about washing a truck?

A. Well, he was reading about—in his transcript that where they took the body, but he was reading this part.

. . . .

A. Well, he was talking about what the transcript said and then he stopped, and J.W. goes, "Don't tell me you were stupid. You didn't wash the truck?"

And then he goes, "Oh, yeah, I washed the truck."

Q. Do you recall anything else?

A. Yes.

Q. What was that, please?

A. What—what he was arguing with this—I think the name's Kurt Cornelison.

Q. What do you recall about this argument of Kurt Cornelison?

A. Well, he said that he couldn't talk too much because the walls had ears, but J.W. asked him, he goes, "Well, what was it over?"

And Robin said, "Drugs."

And then J.W. goes, "You mean you don't like drugs? You don't like dope?"

And he goes, "I didn't say that."

And then J.W. asked him a—he goes, "Well, what do you mean?"

He goes he still couldn't talk because the walls had ears. But he said that he got burned on some drugs or something.

Q. Who said he got burned on some drugs?

A. Well, J.W. was asking questions, and he was just answering them with "Yeah. Yeah. That's how it went." And he said he was—that he bought something.

. . . .

Then he said—J.W. asked if that's what the argument was about, and he said, "Yes."

Q. This argument—did you understand the argument to be between Kurt Cornelison and Robin LePage?

A. Yes.

. . . .

Q. BY MR. SORENSEN: Mr. Thompson, do you recall anything else being said during this conversation?

A. Yes, J.W. asked Robin LePage why—first he asked him, he goes, "You were right by a river, weren't you?"

Robin goes, "Yeah, there was a river around there."

And then J.W. goes, "Well, why in the hell didn't you throw the body in the river?"

And Robin goes, "That's where I slipped up. I hadn't slept in a couple of days. I was tired and I slipped up."

Q. What else, if anything, do you recall from the conversation?

A. J.W. asked why he was hanging around with a little kid and why he had left the kid to be a witness. And Robin goes, "Well, I just made a mistake. I didn't pull the trigger enough," and he had planned on getting rid of John Messinese—

MR. FERRIN: Objection, Your Honor. That is a conclusion—

THE COURT: Yes. Well, you understand you are just to say in substance and effect what a person said.

So the last statement and plan and so forth will be disregarded by the jury.

You state who said what.

THE WITNESS: Robin LePage said that he planned on getting rid of the witness,

John Messinese; that he was going to in a couple of occasions, but things like people turning up, other people, witnesses, other people that he had known, just people that happened to come by turned up and he couldn't do it.

Q. BY MR. SORENSEN: Anything else that you can recall?

. . . .

CROSS EXAMINATION
BY MR. FERRIN:

Q. Charlie, did you ever talk to Robin yourself?

A. Yes.

Q. Just prior to this testimony—or after this conversation you related with Robin and J.W.—

A. Before and after.

Q. —did Robin ever talk to you directly about this thing?

A. Not that I recall.

Q. Have you ever been convicted of a felony?

A. No.

Q. How old are you?

A. Seventeen.

Q. How long were you in that jail?

A. Two months or almost two months. Before I went to Boise, I got there the 23rd the second time.

Q. That is when you overheard this conversation?

A. Yes.

Q. How long have you—the 23rd of what?

A. Of this month—no. Last month.

Q. You have been in jail ever since then, in the Blackfoot jail down here?

A. Yes.

. . . .

Q. Whom did you first tell about this conversation that you overheard, that you say you overheard, between J.W. and Robin?

A. Mr. Summers.

Q. And did he promise you that he would help you get out of that jail?

A. No.

Q. He didn't promise you?

A. Huh-uh.

Q. Do you remember having a conversation with him that was taped?

A. Yes.

Q. Did he say he would try to help you if you talked with him and talked about this case?

A. No.

Q. He didn't make you any promises at all?

A. No.

Q. Why did you testify, then?

A. I'm not really sure. Maybe for once I'm trying to do something good.

Q. I see. Did Mr. Summers promise you that perhaps he could get you some probation if you testified?

A. No.

Q. Did Mr. Summers ever state to you that if you weren't going to go to the pen, would you testify?

A. No.

Q. Did Mr. Summers ever say if you were going to get probation and you were going to go to another town and get yourself a job, would you testify?

A. No.

Q. He never mentioned any of these things to you; is that right?

A. Only one thing.

Q. What did he mention to you?

A. That I wouldn't be in the same place as Robin LePage or his friends.

. . . .

Q. Were you a little reluctant to testify?

A. What do you mean?

Q. Did you—were you not going to testify at one time?

A. Yes.

Q. And why did you change your mind?

A. No real reason.

Q. Did you change your mind after you talked to Mr. Summers?

A. I talked to him the first time and he told me everything—that—let me try and explain this.

Everything he said to me the first time was no more than he said the second time that he talked to me. But I didn't want to testify at first.

Q. You talked to him once and you didn't want to testify; is that correct?

A. Well, when I talked to him the first time, he asked me if I'd testify, and I said I didn't really want to, and he asked me why.

I told him because I didn't want to testify against someone and have me maybe go to the same place as they do. I didn't want to—I was scared.

Q. Then you talked to Mr. Summers again; is that correct?

A. Yes.

Q. What made you change your mind? You're not scared anymore?

A. Oh, I'm scared.

Q. What made you change your mind?

A. I already told you. I don't know.

Q. Just all of a sudden you changed your mind?

A. I didn't really say I wouldn't testify. I just said I didn't really want to because I didn't want to—put it this way: I didn't want to be a rat.

Tr., pp. 748-61.