Robin LePAGE, Petitioner–Appellant,

v.

STATE OF IDAHO and Arvon J. Arave, Respondents–Appellees.

No. 87–3714.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 9, 1987.

Decided June 29, 1988.

See also 102 Idaho 387, 630 P.2d 674.

John C. Lynn, Lynn, Scott & Hackney, Boise, Idaho, for petitioner-appellant.

Lynn E. Thomas, Office of Atty. Gen., Boise, Idaho, for respondents-appellees.

Before FLETCHER[*] and BEEZER, Circuit Judges, and AGUILAR,[**] District Judge.

BEEZER, Circuit Judge:

LePage was convicted of first degree murder in Idaho and sentenced to life imprisonment plus 15 years. He appeals from denial of his petition for writ of habeas corpus. LePage claims that evidence was erroneously admitted in violation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); that he was denied effective assistance of counsel and that Idaho violated his procedural due process rights.

We find the *Massiah* error harmless beyond a reasonable doubt. LePage's remaining claims are without merit. We affirm.

## I

LePage and John Messinese escaped together from a state hospital several days before Kurt Cornelison was murdered. Shortly after the escape, LePage stole a pistol from a parked car. LePage and Messinese then attended a beer party, where LePage argued with Kurt Cornelison. No violence occurred at the party.

After the party, LePage and Messinese stole a pickup truck and drove out of town. Just outside town, they saw Cornelison hitchhiking on the roadside. LePage yelled "there's that son-of-a-bitch," jumped out of the truck, and killed Cornelison with a single gunshot to the head. LePage put the body in the back of the pickup and drove to a remote location, where he sodomized the corpse before disposing of it.

LePage and Messinese abandoned the pickup at Idaho Falls. They traveled to Montana in other stolen vehicles, and LePage stole another pistol. LePage gave Messinese one of the pistols in his possession. The two separated when approached by a police officer. Messinese immediately turned over the pistol to the police officer. LePage traveled to Washington, where he worked on a farm under an assumed name for approximately one week. LePage was arrested in Washington and taken to a jail in Spokane.

Once in custody, LePage made several damaging admissions to officers. Shortly before trial, the state placed an informant in LePage's jail cell, unbeknownst to Le-

[*] Judge Fletcher was drawn to replace Judge Kennedy. She has read the briefs, reviewed the record and listened to the tape of oral argument held on September 9, 1987.

[**] Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

Page. The informant elicited a detailed confession from LePage. Thompson, an inmate in an adjoining cell, testified to the contents of the confession at trial. LePage was convicted of murder in the first degree and sentenced to life imprisonment plus 15 years for using a firearm. Thompson subsequently signed an affidavit swearing that he never overheard LePage make any statements.

On direct appeal, the Idaho Supreme Court concluded that admission of the Thompson evidence constituted a *Massiah* violation, but that overwhelming evidence of guilt rendered the error harmless. On direct appeal, the Idaho Supreme Court also concluded that LePage had not been denied effective assistance of counsel. LePage's petition for post-conviction relief in the state courts, asserting the same grounds raised on direct appeal, was denied. LePage filed a habeas petition in United States District Court. The United States Magistrate denied his petition. LePage appeals this denial of his habeas petition.

## II

The district court had jurisdiction pursuant to 28 U.S.C. § 2254. The district court denied LePage's petition on March 3, 1987 and notice of appeal was filed on March 11, 1987. We have jurisdiction under 28 U.S.C. § 1291.

### A. *Massiah Violations Are Harmless Error*

Ten days before trial, the state placed an informant in LePage's cell. An inmate in the adjacent cell (Thompson) testified to overhearing a conversation between LePage and the informant:

> [The informant] asked Robin LePage ... "You were right by a river weren't you?" Robin goes, "Yeah, there was a river around there."
> And then [the informant] goes, "Well, why in the hell didn't you throw the body in the river?"
> And Robin goes, "that's where I slipped up. I hadn't slept in a couple of days. I was tired and I slipped up."

> [The informant] asked why [LePage] was hanging around with a little kid and why he had left the kid to be a witness. And Robin goes, "Well, I just made a mistake. I didn't pull the trigger enough," and he had planned on getting rid of John Messinese.

■ Since these statements were elicited in absence of counsel, they constitute a violation of LePage's Sixth Amendment rights. *Massiah*, 377 U.S. at 205–6, 84 S.Ct. at 1202–03.

With certain exceptions, harmless error analysis applies to constitutional error. *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3106–07, 92 L.Ed.2d 460 (1986). The harmless error doctrine applies to *Massiah* violations. *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). We need not determine whether the jury in fact relied on the tainted evidence in reaching a verdict. We need only conclude that "it is clear beyond a reasonable doubt that if the jury had not considered" the tainted evidence "its verdict would have been the same." *See Pope v. Illinois*, —— U.S. ——, 107 S.Ct. 1918, n. 6, 95 L.Ed.2d 439 (1987).

The corroborated testimony of John Messinese, an eyewitness to the crime, establishes beyond reasonable doubt LePage's guilt. In addition, FBI analyses linked the victim's body to a blanket found in the pickup truck stolen by LePage. Voluntary admissions by LePage at the time of arrest indicate his knowledge that the victim's body had been sexually assaulted, LePage's dexterity with handguns, LePage's professed ability to destroy fingerprints, and LePage's knowledge that the police did not possess the murder weapon. Testimony by police as to LePage's attitude change upon disclosure that semen in the victim's anal cavity could be traced by blood-typing supports the finding of guilt. Finally, the discovery of a roll of twenty-dollar bills in LePage's possession after the murder, in combination with the absence of a similar roll of bills previously observed on the person of the victim, supports LePage's conviction.

LePage raises several new contentions concerning deficiencies in each of these items of evidence.

■ Initially, LePage contends that Messinese's testimony lacked independent corroboration. To support this broad assertion, LePage argues that Messinese did not tell officers about items of trash which were found near the body until Messinese had arrived at the scene. Even if this were so, overwhelming evidence, including LePage's own testimony, corroborates Messinese's eyewitness testimony. Corroborating evidence for Messinese's eyewitness testimony consists of the following:

1. Messinese testified that he and LePage escaped from State Hospital South on July 23, 1977, eventually arriving at a business establishment, "Spudnik's," in Blackfoot; LePage confirmed that he and Messinese escaped from State Hospital South and arrived at "Spudnik's" in Blackfoot.

2. Messinese testified that he and LePage went to a "beer party" at Jensen's Grove, Blackfoot. Messinese testified that the "beer party" was near a playground and that LePage and Cornelison had an argument. Two individuals in attendance at the "beer party" corroborated Messinese's testimony and identified LePage as having been present at that party. One witness further corroborated Messinese with testimony that the party occurred near a children's playground.

3. Messinese testified that, after leaving the "beer party," he and LePage burglarized a business, "Spudnik's," and proceeded to a second business establishment in search of a vehicle they might steal. Messinese testified that he and LePage stole a white pickup truck. LePage again corroborated Messinese's testimony.

4. Messinese testified that, after driving to Riverside, where he and LePage overtook Cornelison hitchhiking, LePage yelled, "[t]here's that son-of-a-bitch." LePage then jumped from the vehicle and shot Cornelison in the head. A second witness testified that he had given Cornelison a ride to the precise area identified by Messinese as the place where he and LePage had overtaken Cornelison.

5. Messinese testified that LePage placed Cornelison's body in the back of the pickup truck, drove a distance and pulled off the road. Independent physical evidence connects the pickup truck, which LePage admits he stole, to Cornelison's body.

6. The second form of independent physical evidence which links the pickup truck stolen by LePage to Cornelison's body, thus corroborating Messinese's testimony, is fibers found on Cornelison's body; these fibers matched fibers from a blanket. found in the back of the pickup truck.

7. Messinese's testimony is corroborated by other physical evidence not related to the pickup truck. Messinese testified to circumstances strongly supporting the inference that LePage sexually molested Cornelison's body before dumping it. A pathologist gave evidence tending to show that Cornelison's body had been sexually molested. Idaho law provides that "All murder which is perpetrated ... by any kind of willful, deliberate and premeditated killing is murder of the first degree." Idaho Code Ann. § 18–4003(a). The only evidence indicating premeditation and deliberation was offered by Messinese (LePage's *Massiah* admissions established only that he in fact killed Cornelison). Because the jury found LePage guilty of murder in the first degree, we conclude that the jury credited Messinese's corroborated testimony. Under the foregoing circumstances, this conclusion renders *Massiah* violations harmless error.

Next, LePage challenges the probativeness of the FBI agent's testimony concerning the wool fibers found on the body. That the wool blanket was found in the front of the abandoned truck, rather than in the back, does not alter the essential facts: (1) The blanket was found with the truck LePage admits having stolen, and (2) similar fibers were found on the Cornelison body. That no wool fibers were found on Cornelison's trousers suggests only that Cornelison's trousers were removed before the body was wrapped in the blanket (fibers were found on Cornelison's undergarments). This is consistent with Messi-

nese's testimony that LePage sodomized the corpse before disposing of it. Lack of blood on the blanket only suggests that the blanket did not touch the victim's head.

Next, LePage claims that he did not admit to knowing that the corpse had been sexually molested before that fact was made public. The transcript indicates that LePage broached the subject of necrophilia before the officers informed him that the corpse had been molested. LePage claims that he was simply "baiting" the officers by suggesting that they would accuse him of sodomizing the corpse. On a complete reading of the record, we find this assertion untenable. LePage's statement is, first, corroborated by Messinese's testimony and is, second, so extraordinary as to be beyond mere coincidence.

Next, LePage claims that his general boasting about his prowess with firearms and his ability to destroy fingerprints does not indicate that he killed Cornelison or that he destroyed fingerprints which could be used to connect LePage to this particular crime. LePage's statements in this regard do not, by themselves, support the conclusion that LePage shot Cornelison and took care not to leave any fingerprints linking him to the crime. Even so, other evidence against LePage indicates beyond a reasonable doubt that LePage shot and killed Cornelison.[1]

Next, LePage asserts that he became morose when he told police officers about his sister's drug problems, not when the officers told him that they had the murder weapon and that semen found in the corpse could be blood-typed. One of the officers, whose credibility LePage does not challenge, testified otherwise.

Finally, LePage attacks the credibility of Messinese's testimony that Cornelison possessed several $20 bills before his death and that he saw LePage with a large number of $20 bills which LePage claimed to have taken from Cornelison. This does not square with LePage's own testimony con-

cerning income and expenditures from the time he escaped the hospital to the time he and Messinese separated in Montana. That Messinese's testimony was corroborated in numerous other respects adds further support to his testimony concerning the $20 bills.

We conclude from the record that the nontainted evidence produced in state court provides overwhelming proof of LePage's guilt. We also conclude, after careful examination of the record, that corroborated eyewitness testimony provides sufficient proof of LePage's guilt to render admission of the *Massiah* violations harmless error.

### B. *Adequacy of State Post–Conviction Proceedings*

LePage asserts that Idaho was required to afford him an evidentiary hearing on his ineffective assistance and newly discovered evidence (Thompson's affidavit) claims.

On direct appeal, the Supreme Court of Idaho rejected LePage's claim that his counsel was ineffective in failing to object to admission of Thompson's testimony and in failing to provide the court with the proper basis for admission of evidence to impeach Thompson. *State v. LePage*, 102 Idaho 387, 630 P.2d 674, 684–85 (1981). On collateral attack in the Court of Appeals of Idaho, LePage argued that his counsel was ineffective in other respects. *LePage v. State*, 109 Idaho 581, 710 P.2d 10 (1985) ("appellant also submitted a 17–page memorandum detailing potential inadequacies of the trial counsel which might be uncovered by an evidentiary hearing"). The Court of Appeals held that LePage's ineffectiveness claims were *res judicata* because the Supreme Court of Idaho had already considered and rejected ineffectiveness claims based on trial counsel's failure to object to Thompson's testimony and counsel's failure to provide a basis for impeaching Thompson. *Id.* Accordingly, LePage has exhausted his state remedies concerning his

---

1. For example, LePage testified at the preliminary hearing that, when police told LePage that they had obtained the murder weapon from Messinese, LePage responded "You don't have the gun that killed the man if you took it from John." LePage offers no explanation for how he could have known that police could not have obtained the murder weapon from Messinese.

ineffectiveness claims. *See Batchelor v. Cupp,* 693 F.2d 859 (9th Cir.1982).

The federal magistrate determined that LePage had received all the state process to which he was entitled, citing *Kraft v. State,* 100 Idaho 671, 603 P.2d 1005 (1979) (where defendant elects to pursue ineffective assistance claim on direct appeal, *res judicata* may bar reconsideration of issue on post-conviction review). Under these circumstances, LePage was barred under Idaho law from relitigating in state court the ineffective assistance claims he raised on direct review. *See Kraft,* 603 P.2d at 1008.

■ To the extent that LePage's ineffectiveness claims rest on grounds not raised on direct review to the Supreme Court of Idaho, Idaho law precludes him from raising these new grounds in subsequent state proceedings. Idaho statute provides

> Any ground finally adjudicated ... or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application.

Idaho Code § 19–4908.[2] LePage claims that his counsel, the prosecutor, and the trial court agreed that ineffective assistance issues could best be addressed on post-conviction review. Although *Kraft* allowed LePage to raise ineffective assistance claims in collateral proceedings, LePage chose to pursue his ineffective assistance claims on direct appeal. LePage does not claim that his counsel on direct appeal was ineffective in failing to raise all factual grounds which he now alleges constitute ineffective assistance. Accordingly, Le-

Page waived his right to raise additional grounds for ineffective assistance in subsequent state proceedings.

LePage also claims that due process requires the state to provide a hearing on his claim that Thompson committed perjury when he testified to overhearing LePage's conversation with the informant. We need not decide whether due process required a hearing since any error caused by Thompson's alleged perjury was harmless beyond a reasonable doubt.

#### C. *LePage's Counsel Was Not Ineffective*

Under *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), we may consider on the merits claims which LePage raised in state proceedings. LePage may not obtain a determination on the merits of his defaulted ineffective assistance claims unless he shows cause for the default and prejudice arising therefrom. *See Allen v. Risley,* 817 F.2d 68 (9th Cir.1987) (citing *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). When the petitioner's claim relates to errors committed at trial, the petitioner may prove prejudice only by showing that his defaulted claim casts doubt on "the merits of his conviction." *Allen,* 817 F.2d at 69.

LePage asserts that his counsel was ineffective in the following respects: 1) failure to object to admission of statements obtained in violation of *Massiah,* 2) failure to provide authority to the trial court regarding LePage's right to impeach Thompson and officer Summers (the officer who solicited Thompson's assistance), 3) "fail[ure] to adequately investigate the case, and 4) fail[ure] to adequately present the defense before the jury."

The first two claims were raised on direct appeal and disposed of on the merits. These claims are cognizable on federal ha-

**2.** This knowing and intelligent waiver standard of default echos the standard formerly used to determine whether federal habeas petitioners were precluded from raising in federal court claims which were barred by state rules of procedural default. *See Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Onto this personal waiver standard, the Supreme Court of

Idaho has engrafted *res judicata.* That is, a prisoner in Idaho may be precluded from raising claims (including specific errors of counsel) which the prisoner did not argue on direct appeal, even though the prisoner did not *knowingly* and *intelligently* waive claims based on these alleged errors. *LePage v. State,* 710 P.2d at 10; *Kraft,* 603 P.2d at 1008.

beas review. The second two claims (failure to investigate and failure to present the defense) were not raised on direct appeal and are barred by Idaho's doctrine of *res judicata* and Idaho Code § 19–4908.

With regard to the second two ineffectiveness claims, LePage fails to show prejudice since he cannot show how counsel's alleged failure to investigate or to "present" his case caused him to be convicted wrongfully.

■ We analyze LePage's first two ineffectiveness claims on the merits. In order to prove that he was deprived of effective assistance of counsel, defendant must show 1) that counsel's representation fell below an objective standard of reasonableness, and 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2064. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2068. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697, 104 S.Ct. at 2069.

■ Independent, corroborated eyewitness testimony links LePage to the crime beyond a reasonable doubt, thus rendering the *Massiah* violation harmless error. Since admission of statements obtained in violation of *Massiah* was harmless error beyond a reasonable doubt, LePage suffered no prejudice from his counsel's failure to object to the statements. Similarly, LePage suffered no prejudice from any failure of his counsel to impeach Thompson and Summers, since other evidence, reviewed above, establishes LePage's guilt beyond a reasonable doubt.

AFFIRMED.