[No. C004884. Third Dist. Feb. 26, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MICHAEL CATELLI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through XVI.

COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Joel Carey, Anthony L. Dicce and Maureen Daly, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SCOTLAND, J.—A jury convicted defendant of 60 sex crimes committed against 3 victims. (Pen. Code, §§ 261, subd. (2); 286, subd. (c); 288, subd. (b); 288a, subd. (c), 289, subd (a).[1] Allegations that he used a knife during all but one of the offenses and inflicted great bodily injury during four of the crimes were found true. (§§ 12022.3, 12022.8.) The court determined that defendant was sane when he committed the offenses. Sentenced to 557 years in state prison, he raises numerous issues on appeal.

The published portion of this opinion addresses two issues. We consider whether defendant's Sixth Amendment right to counsel was violated when an undercover officer met with him in the jail visiting room in hopes of obtaining incriminating statements regarding defendant's efforts to dissuade the victims from testifying. The meeting had been arranged by an inmate who disliked defendant and wanted to obtain damaging evidence against him. On his own, and unknown to law enforcement, the inmate set up a jailhouse encounter so defendant could meet the inmate's "friend" who would take care of the job of "silencing" the victims. When the inmate informed the district attorney's office of the planned meeting, it was decided that an undercover officer would attend as the inmate's friend. At the meeting, defendant made incriminating statements which were introduced against him at trial.

We also determine whether the term "sexual organ" in section 288a, California's oral copulation statute, includes a man's scrotum as well as his penis.

FACTS

On May 8, 1987, defendant lured two runaway girls, Michelle, aged 12, and Heather, aged 14, into his hotel room where he forced them to commit numerous sexual acts with him and with each other. On June 2, 1987, he

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

enticed another runaway girl, Lucille, aged 16, to come to a hotel room and forced her to commit numerous sexual acts with him. After he was arrested, defendant told an officer that he believed Lucille was 18 and that she consented to have sex with him. He admitted they engaged in two acts of intercourse and one act of oral copulation. Defendant acknowledged staying at a hotel with Michelle and Heather but denied any sexual activity occurred. Additional facts will be discussed in detail in our analyses of defendant's contentions.

## Discussion

### I

Prior to trial, defendant moved to prevent the introduction of evidence concerning statements he made to an undercover officer while in custody because of these charges.[2] ■ ■ ■ ■ Defendant alleged that, in obtaining these statements, police violated his Sixth Amendment right to counsel guaranteed by the federal constitution.[3] A hearing was held which disclosed the following:

Frank S., an informant for federal prosecutors in two other states, met defendant while both were incarcerated in the Sacramento County Jail. From the outset, S. did not like defendant. After learning that defendant was in custody on charges of raping several minors, S. set out, on his own, to obtain incriminating information from him. Defendant confessed to S. and talked to him and other inmates about dissuading the victims from testifying, either by using a "Godfather-type routine" of mutilating animals, or by personal threats, or by whatever it took. Defendant boasted of Mafia connections and offered to pay $5,000 for someone to intimidate the witnesses.

---

[2] Defendant also sought to exclude the testimony of Frank S., an inmate and informant to whom defendant purportedly had confessed his guilt. S.'s testimony was taken conditionally prior to trial (§ 1336, subd. (a)) because he was about to be extradited to face charges in another state. Asserting that S. was unavailable to testify at trial, the prosecutor moved to introduce the transcript of S.'s prior testimony. The motion was taken under submission. A ruling was never made, and the prosecutor abandoned his effort to bring this evidence before the jury. However, S.'s testimony was considered by the trial court with respect to the admissibility of defendant's statements to Officer Simonds. (See discussion, *post*.)

[3] Although defendant's trial counsel referred to *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], no Fifth Amendment claim is made on appeal. "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate . . . . There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Illinois* v. *Perkins* (1990) 495 U.S. __, __ [110 L.Ed.2d 243, 251, 110 S.Ct. 2394].)

When S.'s charges were resolved, he decided to inform on defendant. S. had not done so earlier because he did not want it to appear that he was seeking leniency with respect to the crimes charged against him. While awaiting a court appearance, S. told a deputy sheriff that he had to speak with someone from the district attorney's office about defendant's attempt to intimidate witnesses. This message was brought to the attention of the deputy district attorney assigned to prosecute defendant. In order to determine "whether any plan had been set in motion that would jeopardize the three young girls who were the victims in these cases and to be able to stop any harm from coming to them," the prosecutor arranged for an investigator to meet with S. The investigator was told not to ask anything about defendant's pending charges but simply to "get information about the deal [the proposal to silence the prosecuting witnesses] for the protection of the victims."

After being informed that "he would receive no deals" for the information he had concerning defendant's effort to convince the victims not to testify, S. told the investigator that defendant had confessed. According to S., defendant stated, "I know I'm guilty. You know I'm guilty. I have to get this [defendant's pending case] taken care of." By this, defendant meant the witnesses had to be "silenced" or persuaded not to testify. At the conclusion of the meeting, the investigator did *not* instruct S. to seek additional information from defendant. According to S., "There wasn't any game plan laid out for it, there was no listen for this and look for that and that type of thing." In fact, S. no longer was in the same cell as defendant, and the district attorney's office made no arrangements for S. to "get closer" to defendant.

Nevertheless, S. continued on his own to talk with defendant about the proposal to deal with the victims. As his trial drew closer, defendant became "very adamant about wanting somebody to contact [the victims]" and asked S. if he knew of anyone who could do the job. Unknown to the district attorney's office or any law enforcement officer, S. "arranged" with defendant for one of S.'s "friends" to "take care of [defendant's] problem." He then brought this to the attention of the district attorney's office. When the investigator asked why S. had made such an arrangement in view of the fact that the investigator had never suggested such a course of action, S. replied, "[W]ell, I thought we may be able to send an officer in or you could send someone in to pretend that they [*sic*] were like my friend."

When the prosecutor heard about this development, he and undercover officer Donald Simonds spoke with S. "to find out what [defendant] had told [S.] and what [S.] had told [defendant] concerning the friend who was to meet with him." Again, S. was told he would not benefit from his

cooperation. S. stated he would tell defendant that his "friend" would visit defendant on October 5, and it was decided that Simonds would pose as this friend. Thereafter, S. informed defendant that the previously arranged meeting would occur on October 5.

The meeting between defendant and Officer Simonds took place in the visiting room of the jail and was surreptitiously tape recorded. After a brief introduction in which defendant confirmed that Simonds was the friend he was expecting, defendant asked whether Simonds was a "cop." When Simonds replied in the negative, defendant displayed a handwritten note through the glass partition. The note stated: "All I'll need for you to do, would be to convince a couple of witnesses (teenaged girls) to change each of their stories, and admit that no crime was comitted [*sic*]. *How you convince them is up to you* all they need to do is contact my attorney, admit to him that no crime was comitted [*sic*], and sign a statement to that effect, then testify in court that no crime took place, when jury trial arrives. I have each of their names, addresses, phone numbers, schools they go to, family members [*sic*] names, parents [*sic*] place of employments [*sic*], and other information. Once contract is fullfilled [*sic*], and I am certain you have completed this transaction, you will recieve [*sic*] a fee of 2,500.00 hand delivered from an associate of mine from New York." (Italics in original.) Another note displayed by defendant listed certain books which would aid in establishing his bona fides as a purported member of the Mafia.

After Simonds finished reading the notes, he and defendant discussed their contents, with Simonds repeatedly attempting to have defendant expand on exactly what he wanted done with the victims. Simonds also questioned defendant about how "bad" he wanted "this favor done" and how Simonds would get the information he needed to track down the victims. After the conversation, defendant was searched, and two torn papers were found. Simonds identified them as the notes defendant displayed to the officer.

Defendant testified that S. told him a private detective would visit him to assist in his defense.

The trial court denied defendant's *in limine* motion to exclude both Officer Simonds' testimony concerning the jail house meeting, including defendant's efforts to silence the victims, and the tape recording of defendant's conversation with the officer. The court found that S. was not a police agent; that the "purpose of the state's activities with respect to these matters was to protect the safety of these witnesses and not to obtain incriminating information with respect to the underlying charges;" that "[w]ith respect to the defendant's statements to Officer Simonds, the only purpose of contact-

ing the defendant was fortunately just a minute purpose of determining whether the witnesses were at risk and their safety was in jeopardy;" and that "[t]here was no interrogation concerning the underlying charges."

■ Citing *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] and its progeny, defendant contends that the admission of the tape recording and Officer Simonds' testimony violated his Sixth Amendment rights. He argues that the state knowingly exploited an opportunity to confront him without counsel being present when the prosecutor took the "affirmative step" of having S. arrange the jailhouse conversation with Officer Simonds.

■ The law is as follows: When on his or her own initiative, rather than at the state's behest, an informant obtains incriminating information from an accused, there is no unlawful interference with a defendant's Sixth Amendment right to representation free of governmental intrusion. (*United States* v. *Henry* (1980) 447 U.S. 264, 270 [65 L.Ed.2d 115, 100 S.Ct. 2183]; *People* v. *Whitt* (1984) 36 Cal.3d 724, 742-743 [205 Cal.Rptr. 810, 685 P.2d 1161]; *Thomas* v. *Cox* (4th Cir. 1983) 708 F.2d 132, 135-137; *United States* v. *Malik* (7th Cir. 1982) 680 F.2d 1162, 1165.) However, when a government agent, including an informant acting at the state's request, deliberately elicits incriminating statements from a represented defendant, this action impairs the defendant's Sixth Amendment right to counsel, and the "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, . . ." (*Maine* v. *Moulton* (1985) 474 U.S. 159, 168-174, 180 [88 L.Ed.2d 481, 106 S.Ct. 477]; *United States* v. *Henry, supra,* 447 U.S. at pp. 269-273 [65 L.Ed.2d at pp. 121-124]; *Massiah* v. *United States, supra,* 377 U.S. at pp. 204-207 [12 L.Ed.2d at pp. 249-251].) This is true even if the incriminating information is obtained during the state's investigation of other, uncharged crimes. (*Maine* v. *Moulton, supra,* 474 U.S. at p. 180 [88 L.Ed.2d at pp. 498-499].)

On several occasions, the United States Supreme Court has reexamined what constitutes a deliberate elicitation of incriminating statements within the meaning of *Massiah*. The court in *Maine* v. *Moulton, supra,* 474 U.S. 159 [88 L.Ed.2d 481] broadly interpreted this term. It held that the Sixth Amendment imposes upon the state "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." (*Id.,* at p. 171 [88 L.Ed.2d at p. 493].) Thus, in the view of the *Moulton* court, the Sixth Amendment is violated whenever the state knowingly exploits any opportunity to confront the accused without counsel being present. (*Id.,* at p. 176 [88 L.Ed.2d at p. 496].)

In *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], our high court backed away from the broad pronouncement of *Moul-*

*ton.* In *Kuhlmann,* the police placed a confidential informant into the accused's cell, instructing the informant not to ask the accused any questions but to listen for any statements he might make concerning the charges pending against him. Although this would appear to be a deliberate exploitation of an opportunity to confront the accused without counsel present, the court held that incriminating statements made to the informant were admissible. The court explained: "[A] defendant does not make out a violation of [the Sixth Amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported [the defendant's] incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating statements." (*Id.,* at p. 459 [91 L.Ed.2d at pp. 384-385]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 560 [244 Cal.Rptr. 121, 749 P.2d 776].)

Defendant suggests that the *Kuhlmann* " 'listening post' exception to the Sixth Amendment" is not applicable to this case. He argues: "There was *affirmative* action on the part of the prosecutor to have informant [S.] affirmatively communicate with [defendant] and arrange for the surreptitious meeting with the undercover police officer. There was *affirmative* action in bringing [defendant] down to meet with the undercover officer." (Italics in original.) Defendant misrepresents the record. The testimony of both S. and the district attorney's investigator indicates that the idea to inform on defendant was S.'s alone. The state did not direct S. to act as an informant or to elicit incriminating statements from defendant. This evidence supports the trial court's finding that S. was not acting as an informant for the state. Moreover, the state did not direct S. to arrange the surreptitious meeting with an undercover law enforcement officer. S. did so on his own. When he told the district attorney's investigator of the arrangement he had made, she expressed surprise and asked him why he had done so since the investigator never suggested that he take such action. Granted, after he spoke with the prosecutor and Officer Simonds, S. told defendant when the previously arranged meeting would take place. However, we see no appreciable difference between this and the state's action in *Kuhlmann.* In that case, the state took the affirmative step to place an informant in a position to listen for the accused to volunteer incriminating remarks. Here, S.'s step in telling defendant the date of the meeting which S. already had arranged on his own, not at the government's behest, merely placed Officer Simonds in the position to listen for defendant to make incriminating remarks.

Thus, in our view, the dispositive issue is whether Simonds merely listened to defendant's statements or deliberately elicited them.

The tape recording of the meeting reveals the following: After a brief introduction in which he confirmed that Officer Simonds was the visitor he expected, defendant asked if Simonds was a "cop." When Simonds replied, "No, I'm not," defendant on his own initiative displayed two notes on the glass partition, one of which detailed defendant's request that Simonds convince the victims to change their stories. Up to this point, Simonds had done nothing to deliberately elicit incriminating statements from defendant. He took no action beyond merely listening for what defendant might say concerning the plan to convince the victims not to testify. Accordingly, both the notes and Officer Simonds's testimony concerning defendant's display of the notes and the subsequent seizure thereof were admissible. (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-385].)

However, after reading the notes, Simonds began to ask a number of questions designed to have defendant elaborate on his request.[4] In repeatedly querying defendant about his proposal to silence to victims, including questions concerning the contents of the notes defendant displayed to him, Officer Simonds clearly undertook a course of conduct deliberately designed to elicit incriminating statements from defendant. In doing so, Simonds violated defendant's Sixth Amendment right to counsel. Accordingly, the trial court erred in failing to exclude the tape recording of the conversation and Officer Simonds's testimony about his discussion with defendant after the notes were displayed.

---

[4] There is no written transcript in the record. We have listened to the tape and summarize it as follows: After Simonds read the notes, he said he would need help because he did not know who the teenage girls were and did not know how to find them. Defendant replied, "I have everything you need to know." He told Simonds to do some checking on him, claiming he was a New Yorker who was here "on a business deal and got caught." Simonds also asked what the second paper meant. Defendant told him to write down the names. Simonds asked what it was all about, and defendant stated, "The names that I have given you will show you who I am and who my family is." Simonds asked if the names were defendant's relatives. Defendant said they were. Simonds then asked for more information about the girls and indicated that he was not that interested in getting money for the job; rather, he was hoping to get an introduction, presumably to a high-ranking Mafioso. Defendant said it could be arranged. Simonds asked when he would get the information about the girls. Defendant replied, "As soon as someone delivers something to you, when you're more certain, you come back here and pay me a visit." Simonds asked who the girls were, but defendant did not want to say because he thought the conversation was being taped. Defendant said the girls were White, aged 13, 15 and 16, and were "flaky" kids. The one who "gave [him] up" was a "hooker." Simonds was worried about his expenses, but defendant assured him his costs would be picked up and that Simonds would get all the information he needed about the girls. Simonds asked how serious defendant was and what he wanted done. Defendant replied, "Convince them to change their story." He indicated the victims already knew his background, so Simonds would not need to make too much "contact." When Simonds accused defendant of talking in riddles, he was told that the matter was within his discretion, but "elimination is out of the question." Simonds pressed defendant for specifics and threatened to walk out. Defendant responded that someone would get in touch with Simonds, and that defendant did not want to say anything else on the phone.

However, the harmless error test enunciated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] applies to *Massiah* violations. (*Milton* v. *Wainwright* (1972) 407 U.S. 371, 372 [33 L.Ed.2d 1, 3-4, 92 S.Ct. 2174].) In reviewing *Massiah* error, "We need not determine whether the jury in fact relied on the tainted evidence in reaching a verdict. We need only conclude that 'it is clear beyond a reasonable doubt that if the jury had not considered' the tainted evidence 'its verdict would have been the same.'" (*LePage* v. *State of Idaho* (9th Cir. 1988) 851 F.2d 251, 253, quoting *Pope* v. *Illinois* (1987) 481 U.S. 497, 503, fn. 6 [95 L.Ed.2d 439, 447, 107 S.Ct. 1918].)

As previously noted, up until the time that defendant displayed the notes to Simonds, the officer had done nothing deliberately designed to elicit incriminating statements from defendant. Thus, the notes were properly admitted into evidence. The tape recording and the officer's testimony regarding the subsequent discussion were cumulative and added nothing of substance to the properly admitted, and highly incriminatory, notes. Accordingly, we conclude that admission of the tape recording and Simonds's testimony concerning events which occurred after the notes were displayed was harmless beyond a reasonable doubt.

Even assuming, arguendo, that Officer Simonds violated defendant's Sixth Amendment right to counsel by appearing at the visiting room of the jail, introduction of the notes displayed by defendant, coupled with error in admitting the tape recording and Officer Simonds's testimony, would still be harmless. The evidence of defendant's guilt was truly overwhelming. While the victims were somewhat unclear on the precise number of crimes committed, they were definite in their identification of defendant and in their testimony that he committed numerous forcible sex crimes against them. This testimony was corroborated in many ways. For example, Lucille was observed fleeing half-naked from the hotel room. She appeared to be hysterical. Defendant admitted to an officer that he had sexual activity with Lucille and had been present in the hotel room with Heather and Michelle. The bedsheets bore stains resembling blood and fecal matter. A knife was found at the scene of that crime, and other knives were found in defendant's room at another hotel. Medical testimony revealed the genital areas of Michelle and Heather had been seriously traumatized with lacerations and vaginal bleeding, including an injury consistent with Heather's testimony that defendant "took the knife and he ran it down [her] chin all the way down to [her] vagina and stabbed [her] down there [in her vagina]." Moreover, the crimes were so distinctive that the testimony of Lucille and the account of Michelle and Heather corroborated each other.

Upon this record, any error relating to the jailhouse meeting was harmless. It is clear to us beyond a reasonable doubt that if the jury had not

heard the evidence concerning defendant's effort to dissuade the victims from testifying, its verdicts would have been the same—based on the overwhelming evidence against him, defendant would have been convicted of the multiple sex crimes which he now contests on appeal. (*LePage* v. *State of Idaho, supra,* 851 F.2d at p. 253 [corroborated eyewitness testimony renders *Massiah* violation harmless].)

## II

Defendant was convicted of two counts of forcible oral copulation as to Heather and two counts of lewd and lascivious conduct as to Michelle based upon the following facts: He forced Michelle to lick his scrotum while he made Heather suck his penis. Then, he ordered the girls to switch positions and forced Heather the lick his scrotum while Michelle orally copulated his penis.[5] Neither the information nor the prosecutor at trial specified whether any of the counts was based on defendant compelling the victims to lick his scrotum. However, the People do not dispute defendant's assertion that this episode resulted in convictions of two counts of forcible oral copulation committed against Heather and two counts of lewd and lascivious conduct involving Michelle.

Defendant contends one count of oral copulation and one count of lewd and lascivious conduct must be reversed. His argument is twofold.

 First, he asserts that "merely changing the location of copulation that occurs on the same organ, without interruption, cannot constitute separate offenses." In support of this contention, defendant "maintains that a man's scrotum *and* penis constitute the male 'sexual organ' for purposes of section 288a. Accordingly, any uninterrupted act of copulating different parts of a man's 'sexual organ' constitutes but a single offense." (Italics in original.)

The flaw in defendant's argument is that the acts were not uninterrupted. Rather, they were separated in time and by a change in position. It is now settled that an accused may be convicted for multiple, nonconsensual sex acts of an identical nature which follow one another in quick, uninterrupted succession. (*People* v. *Harrison* (1989) 48 Cal.3d 321, 327-334 [256 Cal.Rptr. 401, 768 P.2d 1078].) The initial sex crimes involving oral copulation of defendant's penis and the licking of his scrotum were completed when defendant ordered Michelle and Heather to stop and switch positions. (*Id.,* at pp. 329-330.) Therefore, separate sex crimes occurred when defendant forced the girls to recommence sucking his penis and licking his scro-

---

[5] Heather testified defendant made her lick his scrotum on at least three separate occasions.

tum, thus compelling them to endure new, unconsented sex acts. (*Ibid.*) ▪ It is equally clear that an accused may be separately punished for sex acts of the same nature committed during a single encounter. (*Id.*, at pp. 335-338; *People* v. *Perez* (1979) 23 Cal.3d 545, 550-554 [153 Cal.Rptr. 40, 591 P.2d 63].) Where " '[n]one of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental' to any other, section 654 [which protects against multiple punishment[6]] [does] not apply." (*Harrison, supra*, 48 Cal.3d at p. 336, quoting *Perez, supra*, 23 Cal.3d at pp. 553-554.) Such was the case here.

▪ Moreover, the trial court reasonably could infer that, in committing the separate sex acts against the victims, defendant had independent objectives other than his own sexual gratification. Over a period of many hours, defendant compelled the victims to do a variety of degrading sex acts, including forcing them to kiss and orally copulate each other. "[T]he 'essential guilt' of sex offenses lies in 'the outrage to the person and feelings of the victim . . . .' " (*Harrison, supra,* 48 Cal.3d at p. 330, quoting § 263.) Under the facts here, it can be inferred that, with each new sex act, defendant had the independent intent and objective to degrade the victims and to further enhance the physical pain, emotional suffering and humiliation they experienced from his repeated violations of their persons. Accordingly, defendant was properly convicted and sentenced for each of these separate sex acts. (See *Harrison, supra*, at p. 335.)

▪ In his reply brief, defendant takes a different tack in challenging the sufficiency of evidence to support separate convictions and punishment for the oral copulation of his penis and the licking of his scrotum. While adhering to his view that "[o]ral copulation of the penis, which reasonably construed includes the scrotum for purposes of section 288a, . . ." he takes the inconsistent, fallback position that "[i]f the scrotum is not included as part of the penis, . . . then only the penis may constitute 'the sexual organ' under section 288a, . . ." and "copulation of the scrotum could not possibly be punished under section 288a because it is not a sexual organ."

As to Michelle, defendant's act of forcing her to lick his scrotum was charged as a violation of section 288, subdivision (b), alleging that he committed a lewd and lascivious act "to wit, oral copulation with MICHELLE [], a child under the age of fourteen years, . . ." Defendant does not raise any issue of defective pleading as to this charge. Since the act of forcing Michelle to lick his scrotum constituted lewd and lascivious

---

[6]Section 654 provides in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

conduct under section 288 whether or not that act constituted oral copulation under section 288a (cf. *People* v. *Pearson* (1986) 42 Cal.3d 351, 355-356 [228 Cal.Rptr. 509, 721 P.2d 595]), the evidence is sufficient to support defendant's conviction under section 288, subdivision (b).

As to Heather, the licking of defendant's scrotum was charged as forcible oral copulation. Section 288a defines oral copulation as "the act of copulating the mouth of one person with the sexual organ or anus of another person."

To determine whether defendant's act of forcing Heather to lick his scrotum constituted oral copulation of his "sexual organ" within the meaning of section 288a, we must apply fundamental rules of statutory construction. ■ Our role as an appellate court is to ascertain the intent of the Legislature so as to effectuate the purpose of the statute. (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) In ascertaining legislative intent, a court must look to the language of the statute and "accord words their usual, ordinary, and common sense meaning based on the language used and the evident purpose for which the statute was adopted." (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; *Valladares* v. *Stone* (1990) 218 Cal.App.3d 362, 368 [267 Cal.Rptr. 57]). In doing so, we must "presume that the Legislature did not intend absurd results." (*In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].) Accordingly, if a statute is susceptible to more than one interpretation, we must adopt the reasonable meaning and reject that which would lead to an unjust and absurd result. (*People* v. *Clark* (1990) 50 Cal.3d 583, 605 [268 Cal.Rptr. 399, 789 P.2d 127]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; see also *People* v. *Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843].) Even if the language of the statute is unambiguous, it " 'should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' " (*Pieters, supra*, at pp. 898-899, quoting *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 133 [145 Cal.Rptr. 674, 577 P.2d 1014], citations omitted, internal quotation marks omitted.) "Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' " (*Id.*, at p. 899, quoting *Lungren, supra*, at p. 735.)

■ With these principles in mind, we conclude that the term "sexual organ" contained in California's oral copulation statute (§ 288a), as applied to males, refers not only to the penis, but also includes the scrotum.

This conclusion is compelled by the usual, ordinary meaning of the phrase "sexual organ." While we can envision little dispute over the mean-

ing of the word "sexual," we turn to the dictionary in the interest of thoroughness. Webster's Third New International Dictionary (1986) defines "sexual" as "relating to the male or female sexes or their distinctive organs or functions . . . ." (*Id.*, at p. 2082.) Stedman's Medical Dictionary (5th ed. unabridged Lawyers' Ed. 1982) states that "sexual" means "[r]elating to sex; erotic; genital." (*Id.*, at p. 1279.) An "organ," as defined in Stedman's, is "any part of the body exercising a specific function . . . ." (*Id.*, at p. 992.) Similarly, Webster's states that an "organ" is "a differentiated structure [i.e., a specialization of *parts* or organs] in an animal . . . adapted for the performance of some specific function and *grouped with other structures sharing a common function into systems.*" (Webster's 3d New Internat. Dict., *op. cit. supra*, at pp. 630, 1589, italics added; see also Webster's New Collegiate Dict. (1973) at p. 808 [defining "organ" as "bodily *parts* performing a function or *cooperating in an activity*," italics added].) In a male, the sexual function is performed not by the penis alone, but also by other parts grouped together to comprise the male reproductive system, including the scrotum. The primary sex glands, i.e. gonads, are the testes. (Stedman's Medical Dict., *op. cit. supra*, at pp. 601, 1431; Webster's Third New Internat. Dict., *op. cit. supra*, at pp. 977, 2362.) The scrotum is the cutaneous pouch containing the testes and parts of the spermatic cords which contain the excretory ducts of the testes. One of the important functions of the scrotum in the reproductive process is to regulate the temperature of the testes for optimum production of sperm. (See Gray, Anatomy of the Human Body (30th American ed. 1985) at pp. 1549, 1550-1551; Stedman's Medical Dict., *op. cit. supra*, at p. 1267.) Since the penis, the testes and the scrotum function together to carry out the reproductive function, each is considered by the aforesaid authorities to be part of the male sexual organ.

Even without resort to these dictionary definitions, one does not have to be a urogenital expert to recognize that the penis is not the only part of the sexual organ within the male reproductive system. As a matter of common sense, a penis without the testes and scrotum is like a flintlock rifle without a flint and flash powder or a bow without a string and arrow. Thus, in the male, the usual, ordinary meaning of the term "sexual organ" refers to "the scrotum, testicles, and penis." (Schmidt, Attorneys' Dict. of Med. and Word Finder (1990) at pp. G-35, S-96.; see also Gray, Anatomy of the Human Body, *op. cit. supra*, at pp. 1548-1552.)

It is this common meaning which courts are compelled by law to adopt in construing the legislative purpose for, and scope of, section 288a. (*In re Rojas, supra*, 23 Cal.3d at p. 155; *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 91 [255 Cal.Rptr. 670, 767 P.2d 1148].)

Moreover, to do otherwise would result in an absurd construction of the statute, an outcome which courts are not at liberty to reach. (*People v.*

*Pieters, supra*, 52 Cal.3d at pp. 898-899; *Lungren* v. *Deukmejian, supra*, 45 Cal.3d at p. 735.) It has long been recognized that section 288a proscribes unlawful oral-*genital* contact. (*People* v. *Harris* (1951) 108 Cal.App.2d 84, 88 [238 P.2d 158].) The gravamen of the offense is the revulsion and harm suffered by one who is forced to unwillingly touch his or her mouth to the genitals of another. (Cf. *People* v. *Harrison, supra*, 48 Cal.3d at p. 330.) To suggest that in enacting section 288a the Legislature intended to proscribe the coupling of the mouth with a penis but not with a scrotum is, in our view, an absurd proposition. Such a construction clearly would not effectuate the purpose of the statute.

Contrary to the dissent's claim, there is nothing in the "historical usage" of the term "sexual organ" in section 288a, or in the language of its predecessor statute, which suggests that as to males the Legislature intended the term to apply only to the penis. Section 288a originally was added to the Penal Code in 1915 to address "sex perversions" and provided: "The acts technically known as fellatio and cunnilingus are hereby declared to be felonies and any person convicted of the commission of either thereof shall be punished by imprisonment in the state prison for not more than fifteen years." (*In re Lockett* (1919) 179 Cal. 581, 583 [178 P. 134]; *People* v. *Carrell* (1916) 31 Cal.App. 793 [161 P. 995].) In declaring this section unconstitutional, the California Supreme Court concluded that " 'it is by no means certain what acts the legislature intended to characterize as the crime of *"fellatio."* ' " (*Lockett, supra*, 179 C. at p. 589, quoting *Carrell, supra*, at p. 795.) In light of this holding, it cannot now be said that the Legislature originally intended that a section 288a act of sex perversion on the male body applied only to oral copulation of the penis. Thereafter, the Legislature repealed this section and enacted a new section 288a "prohibiting sex perversions" and providing: "Any person participating in the act of copulating the mouth of one person with the sexual organ of another is punishable by imprisonment in the state prison for not exceeding fifteen years." (Stats. 1921, ch. 848, § 2, p. 1633.) Nothing in this language suggests that the Legislature intended to depart from the common meaning of the term "sexual organ" and to limit the offense, as performed on a male, to oral copulation of the penis. If the Legislature had so intended, it could have said so. ██ In interpreting section 288a, courts must keep in mind the fact that in outlawing oral copulation with the "sexual organ" of another, the Legislature was "prohibiting sex perversion." Forcing a person to unwillingly lick one's scrotum seems to us to constitute the type of "sex perversion" that the Legislature was seeking to prohibit by enacting section 288a.[7]

---

[7]Defendant does not contend that the licking of his scrotum did not constitute "copulation" within the meaning of section 288a. Such a contention would be unavailing. As the dissent properly notes, the early construction of "copulation" to exclude the "mere kiss or lick

■ The fact that the Legislature used the singular term "sexual organ," as well as the anus, does not compel a conclusion that the crime of oral copulation performed on a male applies only to the penis and anus. Section 7 provides that, as to words used in the Penal Code, "the singular number includes the plural, and the plural the singular; . . ." "The rule of construction enunciated in section 7 is no mere rubric—it is the law." (*People* v. *Jones* (1988) 46 Cal.3d 585, 593 [250 Cal.Rptr. 635, 758 P.2d 1165].) Thus, to the extent practicable, we must interpret the singular phrase "sexual organ" in section 288a to be consistent with the plural term "sexual organs." (*Ibid.*) Such a construction is practical and appropriate because, as noted in Webster's Third New International Dictionary, *op. cit. supra*, at pages 946, 2082, the term "sexual organ" often is used in the plural to refer to the genitalia, i.e., "the organs of the reproductive system; *esp*: the external genital organs." (Italics in original.) This plural interpretation of the term "sexual organ" is the only one which is consistent with the apparent intent of the Legislature in enacting section 288a and does not result in an absurd construction of the statute.

We are mindful of the principle that where a statute is susceptible of two reasonable interpretations, it must be construed in favor of defendant. (*Dunn* v. *United States, supra*, 442 U.S. 100, 112 [60 L.Ed.2d 743, 754]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1145-1146 [240 Cal.Rptr. 585, 742 P.2d 1306].) However, for the reasons stated above, we conclude that, as to males, limiting the term "sexual organ" to the penis is not a reasonable interpretation of section 288a. Accordingly, this construction must be rejected in favor of the only reasonable interpretation, namely that the term "sexual organ" in section 288a includes a man's scrotum as well as his penis. (Cf. *People* v. *Pieters, supra*, 52 Cal.3d at pp. 898-902; *People* v. *Jones, supra*, 46 Cal.3d at p. 599; *Anderson, supra*, 43 Cal.3d at pp. 1145-1146.)

Defendant was properly convicted under section 288a for his act of forcing Heather to lick his scrotum.[8]

---

of the private organ, even though lewdly done" (*People* v. *Angier* (1941) 44 Cal.App.2d 417, 419 [112 P.2d 659]) has been repudiated. (*People* v. *Harris, supra*, 108 Cal.App.2d at p. 88; *People* v. *Cline* (1969) 2 Cal.App.3d 989, 992-993, fn. 2, 996 [83 Cal.Rptr. 246].) Copulation means the act of coupling or joining. (Webster's 3d New Internat. Dict., *op. cit. supra*, at p. 503.) The term "mouth" includes "the structures enclosing or lying within the mouth cavity regarded as a whole." (*Id.*, at p. 1479.) Under the rules of statutory construction discussed in the body of this opinion, forcing one to lick another's scrotum constitutes the act of copulating the mouth of one person with the sexual organ of another within the meaning of section 288a. A contrary interpretation would be inconsistent with the ordinary meaning of the words of the statute and would result in an absurd construction which would not give effect to the intent of the statute.

[8]See footnote 7, *ante*.

III-XVI*

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed in part with directions to the trial court to (1) reduce the sodomy conviction (count XLVIII) to attempted sodomy, for a consecutive term of three years, and strike the ancillary section 12022.3 use enhancement; (2) strike the great bodily injury enhancement ancillary to count XXXVIII; (3) prepare a new abstract of judgment setting forth defendant's sentence, 546 years in state prison; and (4) forward a certified copy of the abstract to the Department of Corrections. In all other respects, the judgment is affirmed.

Sims, J., concurred.

**CARR, Acting P. J.,** Concurring and Dissenting.—I concur in the judgment except as to part II, to which I dissent. In my view defendant's act in forcing Heather to lick his scrotum does not constitute oral copulation within the meaning of Penal Code section 288a. I shall explain why this is not an absurd result, as the majority holds.

In part II, the majority undertakes to define the male sexual organ as that term is used in section 288a. Essentially that definition is of the entire male reproductive system, comprising the penis, the scrotum and testes together with the internal workings thereof. I observe at the outset that section 288a since its inception has never used the words reproductive system to define sexual organ. Nor does the majority's definition withstand historical scrutiny.

The initial California statute passed in 1915, Penal Code section 288a, criminalized "[t]he acts technically known as fellatio and cunnilingus." (Stats. 1915, ch. 586, § 1, p. 1022.) This statute was found to be unconstitutional not because the word fellatio failed to describe the prohibited conduct but because it was not in the English language as required by former article IV, section 24 of the California Constitution, its usage was not in the common parlance and it was therefore uncertain in meaning to a person of common understanding, presumably those persons who might be expected to violate the section. (*In re Lockett* (1919) 179 Cal. 581 [178 P. 134].)[1] The *Lockett* court recognized that when foreign words had by usage become anglicized and were readily understood by reference to "lexicons," "in the

---

* See footnote *ante*, page 1434.
[1] This court, under the guidance of Presiding Justice Chipman, had reached a similar conclusion prior to *Lockett*, in *People* v. *Carrell* (1916) 31 Cal.App. 793 [161 P. 995].

interests of decency, courts should sanction such words, euphemistically employed to describe offenses against morality, thus avoiding the bald nastiness involved in the use of the vernacular, . . ." (*Id.* at p. 583.)[2] The word fellatio, while sufficiently euphemistic, had not become sufficiently anglicized that it was a part of the English language with a meaning acquired by such use. The *Lockett* court observed the word "does not occur in any of the English dictionaries in common use" (at pp. 584-585), but was used and defined only in works such as Stedman's Medical Dictionary, Dorland's American Illustrated Dictionary, Havelock Ellis's "Studies in the Psychology of Sex," and Krafft-Ebing's "Psychopathia Sexualis." The common man, not being exposed to such literature could not be expected to know what conduct was proscribed.

While modesty of the times doubtless prevented the Legislature from defining the crime more clinically,[3] presumably such members of the Legislature in 1915 had access to the medical texts and literature available to the courts if not the man of common understanding. It is reasonable to assume that to avoid the "bald nastiness involved in the use of the vernacular" (*In re Lockett, supra*, 179 Cal. at p. 583), the Legislature "euphemistically employed" fellatio to describe this offense against morality. In such texts and dictionaries of that era, the term itself had a definitive meaning and that was oral stimulation, euphemistically speaking, of the penis.[4]

Since its original enactment in 1915, section 288a has been amended or reenacted 15 times.[5]

In 1921 the statute was rewritten to prohibit sex perversion, defined as "the act of copulating the mouth of one person with the sexual organ of another . . . ." (Stats. 1921, ch. 848, § 2, p. 1633.) In *People* v. *Parsons*

---

[2] The *Lockett* court, with unusual if somewhat unsophisticated concern, found that some definitions of the term referred to active conduct and others to passive and this rendered uncertain the prohibited conduct. (179 Cal. at pp. 585, 590.)

[3] "So squeamish are some English-speaking people on this point that they have no terms to designate the 'nameless crime' that moves in the dark." (2 Witthaus & Becker, Medical Jurisprudence, Forensic Medicine and Toxicology (2d ed. 1907) Unnatural Crimes; Buccal Coitus, p. 750.)

[4] Fellatio is derived from the Latin *fellare*, meaning "to suck." (Webster's New Internat. Dict. (3d ed. 1971) p. 836.)

[5] Statutes 1921 chapter 848 section 2, page 1633; Amended Statutes First Extraordinary Session of 1950, chapter 56 section 1, page 512; Statutes First Extraordinary Session of 1952, chapter 23 section 2, page 380; Statutes 1955, chapter 274, section 1, page 729; Statutes 1975, chapter 71, section 10, chapter 877, section 2; Statutes 1976, chapter 1139, section 178, operative July 1, 1977; Statutes 1977, chapter 490, section 2; Statutes 1978, chapter 579, section 18; Statutes 1979, chapter 944, section 7; Statutes 1980, chapter 915, section 2; Statutes 1981, chapter 896, section 2; Statutes 1982, chapter 1111, section 5; Statutes 1983, chapter 949, section 3; Amended Statutes 1986, chapter 1299, section 6; Amended Statutes 1988, chapter 404, section 1.

(1927) 82 Cal.App. 17, 19 [255 P. 212], the court rejected a contention that the new statute was vague, uncertain or indefinite. Any person who participated in the proscribed conduct was guilty of the offense, whether as an active or passive participant, thereby putting to rest the active passive concern of the *Lockett* court.

Initially, in *People* v. *Angier* (1941) 44 Cal.App.2d 417 [112 P.2d 659], the term "copulation" was construed narrowly: "A mere kiss or lick of the private organ, even though lewdly done (Pen. Code, [ § ] 288), is not a copulation." The court arrived at this conclusion by assessing the meaning of the term copulation, stating "[t]he word copulation has never had the meaning of mere contact. It has always had the significance of the verb, to 'couple', which . . . is derived form the Latin *copulare*, which is translated 'to couple, join, unite, band or tie together.'" (*Id*. at p. 419.) That view was subsequently repudiated even by its own author (*People* v. *Harris* (1951) 108 Cal.App.2d 84, 88 [238 P.2d 158]), the court acknowledging the holding of *People* v. *Angier, supra*, did not comport with the legislative intent of section 288, subdivision (a). "[W]e were led into a discussion of the significance of the word 'copulate.' While that discourse was philologically correct it was calculated to lead to the erroneous doctrine that the use of the word in section 288a signifies a legislative intent that an offender of the statute is guilty only when he has committed the repulsive act of sex perversion. Such was not the purpose of the lawmakers or the intention of this court. A person is guilty of violating the statute when he has placed his mouth upon the genital organ of another." (*Id*. at p. 88.)

Consensual oral-genital contact was decriminalized by our Legislature in 1975. (Stats. 1975, ch. 71, § 10, p. 134.) The conduct now prohibited by the statute depends on the status of the participants, i.e., minors or prisoners, or the use of force by a sexual aggressor.

The present statute, Penal Code section 288a, retains the 1921 definition of oral copulation: "(a) Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person." (Stats. 1986, ch. 1299, § 5, p. 4595.)

Despite the numerous amendments and revisions made to section 288a, the Legislature has continued to leave the word sexual organ undefined in such section. The defendant contends, not implausibly, that, as to a male sexual organ, section 288a refers to the penis. The People, in an argument accepted by the majority, urge the statute refers to all external genitalia, the penis, the testicles and the scrotum.

The Legislature was free to use "genitalia" or such similar term in lieu of "sexual organ" but chose not to do so. In Penal Code section 311.3,

subdivision (b)(1), the sexual exploitation of children statute, sexual conduct is copiously defined, among other listed conduct, as "[s]exual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, . . ." The sexual battery statute, Penal Code section 243.4 criminalizes the touching of "an intimate part of another person." "Intimate part", is defined by section 243.4, subdivision (f)(1), as the "sexual organ, anus, groin, or buttocks of any person, and the breast of a female." The term "private parts" which is certainly euphemistic enough, is employed in the indecent exposure statute, which makes it a crime for any person to wilfully and lewdly "[e]xposes his person, or the private parts thereof, in any public place" (Pen. Code, § 314). I think it reasonable to assume that persons of common understanding know what private parts are. If the term were private part, there might be some uncertainty but with private parts, an all-encompassing term, there is no uncertainty.

Unless it can be said that sexual organ means genitalia as used in section 288a, defendant's assertion has merit.

The historical derivation of section 288a and the usage of sexual organ in that section strongly suggests that as to a male, the statute refers to the penis. As noted, the original statute proscribed "fellatio," from the Latin *fellare*, to suck, and while there may have been some initial uncertainty as to its meaning as to whether both passive and active conduct was included, the term referred to the penis and it was so defined in the dictionaries and treatises current at the time of original enactment as well as present day dictionaries. Nowhere is such term defined to cover oral-scrotal contact. The subsequent statutes describe the conduct as "oral *copulation*." Copulation normally involves penile-vaginal contact. *Oral* copulation by its terms suggests the replacement of either the penis or vagina with a mouth. *People v. Angier, supra*, 44 Cal.App.2d 417, focused on the word "copulating" in determining (at p. 419) that licking or kissing the "private organ" was not proscribed: "The word copulation has never had the meaning of mere contact. It has always had the significance of the verb 'to couple.'" The cases which distinguished or criticized *Angier* did not expand the organs capable of being assaulted, but expanded the manner of the assault, i.e., licking or osculating (kissing) were proscribed. (See *People v. Cline* (1969) 2 Cal.App.3d 989, 992-993, fn. 2, 996 [83 Cal.Rptr. 246]; *People v. Harris, supra*, 108 Cal.App.2d at p. 88.) A man does not copulate with his scrotum but with his penis. "Oral" copulation, when referring to the male body, as a matter of common sense, involves oral contact with a penis.

The Legislature has devised an elaborate structure of penal sanctions for various types of sexually-oriented conduct. The forcible lick or kiss of a scrotum could violate section 288, lewd and lascivious conduct, if the victim were under the age of 14 or section 243.4, sexual battery. I conclude such

conduct, however, is not oral copulation. At best the Legislature's choice of the term "sexual organ" is ambiguous, in light of the historical derivation of the statute.

In construing ambiguous statutes, we have certain well-defined rules. The provisions of the Penal Code "are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (§ 4.) They " 'are to reach no further in meaning than their words; no person can be made subject to them by implication; and all doubts concerning their interpretation are to preponderate in favor of the accused.' " (*People* v. *Tisdale* (1880) 57 Cal. 104, 107 [57 Cal. 104].) Where the language of a statute is reasonably susceptible of two constructions the statute must be construed in favor of defendant. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1145-1146 [240 Cal.Rptr. 585, 742 P.2d 1306]; *Dunn* v. *United States* (1979) 442 U.S. 100, 112 [60 L.Ed.2d 743, 754, 99 S.Ct. 2190].) Under such construction, the male sexual organ, within section 288a, refers to the penis.

The majority holds this result is "absurd," citing to *People* v. *Pieters* (1991) 52 Cal.3d 894 [276 Cal.Rptr. 918, 802 P.2d 420], and *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727 [248 Cal.Rptr. 115, 755 P.2d 299]. These two cases enunciate the rule of statutory construction that the language of an unambiguous statute will not be given a literal meaning if such a construction would result in absurd consequences not intended by the Legislature.

The rule sought by the majority is summarized in *People* v. *Jones* (1988) 46 Cal.3d 585 [250 Cal.Rptr. 635, 758 P.2d 1165], at page 599: "The rule of statutory interpretation that ambiguous penal statutes are construed in favor of defendants is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e., that resolution of the statute's ambiguities in a convincing manner is impracticable. [Citations.]" (See also *People* v. *Alday* (1973) 10 Cal.3d 392, 395 [110 Cal.Rptr. 617, 515 P.2d 1169].) The position of the majority is that it is not reasonable that "sexual organ" when referring to a male means "penis." But the Legislature has constructed an intricate, almost byzantine, maze of laws criminalizing sexual depradations (see generally 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Decency and Morals, § 760 et seq.), and often the definitions seem arbitrary. Had the Legislature sought to prohibit more than "fellatio" and "cunninlingus" when it enacted the 1921 statute, it could easily have done so. The fact that reasonable minds may differ on this question suggests the answer, that each interpretation of the statute is equally plausible, and therefore defendant should not have to guess which is the law.

The majority cites *People* v. *Harrison* (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401, 768 P.2d 1078], at page 330, that "The gravamen of the offense is the revulsion and harm suffered by one who is forced to unwillingly touch his or her mouth to the genitals of another." (Maj. opn., *ante*, at p. 1450.) *Harrison* did not so hold, did not involve oral copulation but digital penetration and concerned the propriety of multiple convictions, a wholly different issue. The issue here is the definition of the offense, not the nature of the harm sought to be avoided.

The majority turns the history of the statute on its head. When the Legislature rewrote the statute in 1921 to avoid the holding in *In re Lockett, supra,* 179 Cal. 581, it was no doubt reluctant to "stain the pages" (*People* v. *Carrell, supra,* 31 Cal.App. at p. 795) of the Statutes of California with an explicit list of the conduct to be proscribed. But the modesty of that era cannot be used as a shield today to obscure what this case is about: Since it was within the power of the Legislature to specify with exactitude the conduct to be proscribed, the defendant is entitled to a reversal as he has tendered an alternate, reasonable construction of the statute, that sexual organ in section 288a denotes the penis only.[7]

Appellant's petition for review by the Supreme Court was denied May 16, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

[7] I note further that the dictionary expressly lists "penis" as a synonym for organ. (Webster's Third New Internat. Dict. (3d ed. 1971) p. 1589.) There is no equivalent reference to testicles.