[No. C023551. Third Dist. Mar. 9, 1999.]

THE PEOPLE, Plaintiff and Appellant, v.
CHARLES FREDERICK NEELY, Defendant and Respondent.

[No. C024936. Third Dist., Mar. 9, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES FREDERICK NEELY, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III. through IX.

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger, W. Scott Thorpe, William G. Prahl and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Appellant and for Plaintiff and Respondent.

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant and for Defendant and Respondent.

**OPINION**

**MORRISON, J.**—After two earlier felony convictions and prison terms, defendant Charles Frederick Neely committed his first robbery murder in 1956. (*People* v. *Neely* (1958) 163 Cal.App.2d 289 [329 P.2d 357].) After completion of his "life" sentence (his second) he was loosed upon the populace in 1975 and thereafter committed a home-invasion robbery murder on March 15, 1982. (*People* v. *Neely* (1993) 6 Cal.4th 877 [26 Cal.Rptr.2d 189, 864 P.2d 460].)

The authorities turned a codefendant, Malcolm Centers, against defendant and arranged for a taped conversation between them (the van tape).

Defendant was sentenced to death, but the California Supreme Court vacated his conviction on the ground that the authorities had violated his right to counsel and his attorney failed to object to evidence adduced by the violation. (*In re Neely* (1993) 6 Cal.4th 901 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

The case was remanded. Neely successfully moved to recuse the district attorney's office, claiming bias in the decision to seek the death penalty a second time. The Attorney General filed a notice of appeal (No. C023551) which automatically stayed the recusal order. (Pen. Code, § 1424, subd. (a)(1); further section references are to this code.) The case proceeded to trial. The trial court forbade the People from seeking the death penalty.

Defendant was convicted of murder, robbery and burglary. He had admitted a prior-murder special circumstance and the jury found true robbery and burglary-murder special circumstances, but found not true gun use allegations. He was sentenced to a third "life" sentence, this time without possibility of parole. Defendant appealed (No. C024936) and we consolidated the appeals. We shall vacate the recusal order, modify the judgment and affirm.

### FACTS

Three men planned to burgle an occupied house in daylight. One of the homeowners was handcuffed and shot in the head during the burglary.

Defendant, a man in his 50's, and 2 young men, both in their 20's, Malcolm Centers and Monte Handley, planned to burgle Bruce Chester's safe and anticipated that he and his wife Barbara (Teater) Chester would be or might be home. Centers had agreed to do the crime at the behest of one Robert DeArkland, who was angry with Chester over a land deal and to whom Centers owed a large drug debt. Centers used and sold drugs; DeArkland was his source for cocaine, amphetamine and LSD and defendant was his source for marijuana and mushrooms. Centers used Handley (who was Black) to sell drugs to Blacks. Centers knew Bruce Chester and agreed to help steal some papers from Chester's safe because he was afraid of DeArkland. Defendant also knew Chester and had done work at his property. DeArkland told Centers that defendant would be part of the burglary team. On a later occasion he told Centers it would be better if Chester was dead.

Defendant, Centers and Handley met to discuss the job. Defendant was the leader. Centers would show them to the property, defendant would open the safe and Handley would steal other items to disguise the purpose of the burglary. They had guns, tape, gloves and a package with "Mrs. Bruce Chester" on it, in case they needed to employ a ruse. Handley had a

.32-caliber pistol and defendant had a .22-caliber High Standard pistol; both carried handcuffs.

On the morning of the murder, Centers's live-in girlfriend woke up to find Handley and defendant in the kitchen; she heard defendant say "something about a gun jamming." Centers told her he was going to show defendant a house. She could not recall other events that she had once described to the authorities about that morning. She had used drugs until a few years before the retrial in 1996. However, she did remember talking to the authorities and being truthful. In that interview she said she heard the men talking about tying up a woman and knew they were going to break into a floor safe that DeArkland had told them about. The transcript of her statement indicates she described defendant's gun as a .22 "*Ruger*." This may be a typographical error. An expert testified a *Luger* pistol resembles the High Standard.

On the morning of the murder the trio used defendant's wife's Chevrolet truck, which was white, and Centers's Ford Ranchero. Eventually, the group had breakfast at a restaurant in Cameron Park near the Chester house. They were noticed because of their composition (an older man with two younger men, one Black) and because they did not seem normal. Then Centers led them to the house. They watched the house with binoculars and knew Chester and his wife were there. They left and Centers unsuccessfully tried to get Chester to leave with a telephone call about drugs. The trio returned and as they approached Chester's house, Centers got out of the truck for fear of being recognized. Defendant and Bruce Chester spoke, then defendant left and picked up Centers. The three left so defendant could use a telephone, then drove back to the Chester home. Defendant and Handley dropped Centers off at the "waterfall house," which was near some property owned by Centers's father.

As Chester prepared to leave for a meeting, Barbara Teater heard yelling and loud noises. At one point she heard her husband say " 'I'll take you to the safe.' And I heard a voice, a very mean voice say, 'Yeah, you take me to the safe. You take me to that safe or I'll blow your fucking head off.' " She hid, then decided to get help. She heard a loud bang, got into her car and drove away to call the police. She saw a man on the road by the "waterfall house," hiding his face. Peace officers arrived within four minutes of her call and saw two men run off.

Chester was found. He was handcuffed and dead. He was killed by a contact gunshot to the head and had another bullet wound high on his left arm; two .22-caliber cartridge casings and three .22-caliber bullets were found (one in a wall, one on the floor and one in Chester's brain). That only

*two* cartridges were found corroborates the evidence about defendant's gun jamming: An expert testified that when a semiautomatic pistol jams, it may not eject the spent cartridge.

Handley and Centers were captured that day. Handley had some stolen property on him and a glove. The white truck (defendant's wife's truck) was in the Chesterses' driveway. Gloves, pliers, rifle shells, a knife, shotgun shells, binoculars and tape were found in the truck, as was the "Mrs. Bruce Chester" box and a clip for a .22-caliber High Standard pistol. Handley's and Centers's fingerprints were on the white truck or its contents. Gloves and Handley's gun were found near the Chester house.

The morning after the murder, around 3:00 a.m., a firefighter heard noises in his station and found evidence that clothes had been ransacked. That night defendant broke into a vacant house near the firestation. Two days after that, on March 18, 1982, defendant emerged from a field and asked John Huntington for a ride to Sacramento. He recognized defendant and told his father, who captured defendant at gunpoint.

At one point while Centers sat on a bench in custody, defendant nodded to him and said "We had to shoot the bastard." Several weeks after the murder Teater heard defendant's voice sample in court and was able to identify it as the voice she heard during the crime.

Centers had been acquitted of the murder, but convicted of conspiracy to commit robbery. He sold drugs while on parole. At defendant's retrial, the instant case, Centers was severely impeached and the defense pointed to evidence that Centers was at the house. The defense attacked Teater's voice identification with expert testimony, which was rebutted by contrary testimony: The People's expert told the jurors their "intuitive theories are just as good as any conclusion you can draw from the research."

## I.

The Attorney General contends the trial court abused its discretion in ordering recusal of the district attorney's office. Defendant complains that the stay of the recusal order forced him to choose between his speedy trial rights and his due process right to an unbiased prosecution. We need not decide whether the automatic stay provision might work an injustice in some cases, because it did not here. The recusal order should not have been made. Further, due to subsequent events, the only purpose of the recusal was obviated, and defendant cannot show prejudice.

## A.

A recusal order is reviewed under the abuse of discretion standard, which gives room for the exercise of judgment by the trial court. (*People* v.

*Eubanks* (1996) 14 Cal.4th 580, 594-595 [59 Cal.Rptr.2d 200, 927 P.2d 310].) The trial court does not have discretion to depart from legal standards. (*Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424.)

A motion to recuse "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) A " 'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner. Thus, there is no need to determine whether a conflict is 'actual,' or only gives an 'appearance' of conflict." (*People* v. *Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5], approved in *People* v. *Hamilton* (1988) 46 Cal.3d 123, 139-140 [249 Cal.Rptr. 320, 756 P.2d 1348].) "[T]he potential for prejudice to the defendant—the *likelihood* that the defendant will not receive a fair trial—must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness. Thus section 1424 . . . does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system. [Citations.]" (*People* v. *Eubanks*, *supra*, 14 Cal.4th at p. 592, original italics.) Put another way, the trial court must find it *likely* the defendant will be treated unfairly. (*People* v. *Millwee* (1998) 18 Cal.4th 96, 123 [74 Cal.Rptr.2d 418, 954 P.2d 990].) The evidence and findings here are to the contrary.

The facts regarding the death penalty determination, implicitly credited by the trial court, are as follows. The district attorney during defendant's original trial was Ronald Tepper. He died and Walter Miller took over the office in May 1989. The California Supreme Court's remittitur issued in February 1994 and Miller chose not to seek the death penalty again. In March, Deputy District Attorney Gary Lacy filed for election to Miller's job in the June 1994 primary election. During the ensuing campaign, Lacy emphasized that Miller had never sought the death penalty during his tenure and claimed he was "soft on crime." In one advertisement Lacy referred to defendant's case, although not by name, and in debates defendant's name was mentioned. The tenor of these references was that Miller had made a mistake in not pursuing the death penalty in defendant's case, though Lacy never actually said he *would* seek the death penalty if elected. After losing the election, Miller assigned the case to Lacy, who announced a few days later that he would seek the death penalty.

Miller and Lacy testified about the various factors each considered in making the death penalty decision. Miller conceded the crime merited the

death penalty and that he had agreed with Tepper's decision to seek it in the first trial. He also conceded defendant's record favored the death penalty. He and Lacy simply disagreed on the strength of the case, the likelihood of an actual execution due to lengthy appeals and defendant's age and health, and the importance of cost to the public in pursuing the death penalty. Lacy had a different "prosecutorial philosophy" and did not believe that there should be a "price tag on justice," but that the death penalty decision should be made based on the crime and the defendant's record, rather than age, problems with the case and so forth.

There is no dispute that Lacy *offered defendant a plea bargain.* The court overruled defendant's objection to evidence of this offer because "that's the very thing that this whole thing is aimed at as to whether or not he can exercise prosecutorial discretion in an evenhanded manner, and one way that would certainly show that would be the fact that he is willing to come off of this position of the death penalty. . . . It would show he's not irrefutably married to the proposition that this has to be death and nothing else for Mr. Neely." Lacy agreed to drop the death penalty if defendant would plead guilty and accept life without parole, and Lacy also agreed to review defendant's medical records to determine whether to drop the death penalty based on poor health, apart from a plea.

Defendant emphasized the fact the death penalty decision was made soon after the case was given to Lacy. The court clarified the relevance of that point: "But that presupposes that Mr. Lacy[,] having campaigned on this issue[,] at a later date when he actually has the authority to deal with the case is unable then to look at it in an evenhanded manner." The trial court then rejected defendant's claim that Lacy made the decision without considering the facts, finding that he reviewed a sufficient amount of material and "was in a position to make such a decision, and since then the evidence would indicate that he would be able to be evenhanded."

The judge then said "However, it seems to me that the appearance problem is more important." After correctly quoting the legal standard from the Attorney General's papers in the trial court, the court inexplicably said: "The thing that concerns me is how this will appear to the public. I don't think that a case has been made that as a matter of fact Mr. Lacy cannot be evenhanded, but what's the public going to say?" The court mentioned that the *public* would view the decision as fulfillment of a campaign promise.

The court then said "In addition to that," Lacy "would have to have in the back of his mind a concern that whoever may challenge him might use the same argument. If it was a useful campaign issue in his campaign . . .

maybe the next guy who decides to run against him might make that same argument[.]" Thus Lacy was aware of the consequence of not seeking death in this case.

The court then said: "And it just seems to me that the appearance so far as the public perception in terms of fairness leans in favor of the defendant. I just don't think that the District Attorney hanging on to this case is the right thing to do. I think the motion for recusal should be and it is for that reason granted." Later at that hearing the trial court clarified "If it weren't for the campaign . . . then I probably would have denied the motion. [¶] But I think because of the election campaign and because it having been a prominent issue there and because of the appearance to the public of his now proceeding with the death penalty, that it justifies the granting of the recusal."

Defendant points out that Deputy Attorney General Thorpe emphasized to the trial court the proper legal standard and infers the trial court must have applied those standards, absent an explanation of "how a court, armed with the correct principles of law, could be so legally dyslexic as to ignore them blatantly." We cannot answer his question, except by reference to the written transcript of the trial court's findings, set out at length above. The trial court expressly found defendant had not carried his burden to show that Lacy would be unfair. That finding is supported by the evidence, particularly Lacy's offer to plea bargain away his right to seek the death penalty. That offer would leave him as vulnerable to future challengers as not seeking the death penalty in the first instance. The trial court went on to emphasize how the public might view the matter, which is contrary to the law, as stated in *People* v. *Eubanks, supra*, 14 Cal.4th 580, quoted above. Indeed, during a later discussion of the automatic stay of the recusal order, the trial court made his views even more clear: "And personally, I think this appearance of impropriety rule is too bad. I think prosecutors . . . ought to be as biased as they want to be in favor of conviction and prosecution. But that, unfortunately, is not what the courts have told us. So, appearance of impropriety is a basis for recusing the District Attorney." Even defendant's attorney agreed the ruling was based on an appearance of propriety, not an actual conflict. We mention this last point not to infer that defendant has waived anything, but simply to point out there was no "ambiguity" about the trial court's findings in the trial court; it arises only in appellate counsel's brief.

Defendant contends that viewing the trial court's comments in his favor, we must assume that the trial court meant *because of the appearance to the public* Lacy would tailor his charging decision in the case. That is not a construction of the trial court's findings, but the creation of a new finding not made. The trial court found Lacy would be evenhanded. The fact that

Lacy would be aware of the possible consequences of not seeking the death penalty is not at all the same as a finding that Lacy would use that knowledge in derogation of his duty. Nor can we accept defendant's assumption that candidates for public office invariably adhere to campaign positions, or his cynical assumption that they adhere to those positions, if at all, only *because they were made in the campaign,* rather than because they reflect sincere beliefs.

The recusal order was improper and should be vacated.

## B.

Defendant contends he should not have been prosecuted by Lacy's office pending the appeal from the recusal order. Defendant acknowledges the statute required a stay of the recusal order upon the filing of a notice of appeal. He concedes the issue is moot *as to the Attorney General,* who did not have to take the case to trial, but argues it is not moot as to him. Even if we agreed that the automatic stay presented some sort of dilemma, defendant has not shown prejudice.

After the Attorney General filed the notice of appeal, the district attorney moved to continue the trial, pending the outcome of the appeal. Defendant opposed the continuance and asserted his right to a speedy trial. He objected to having to choose between asserting his right (by virtue of the recusal order) to be prosecuted by the Attorney General and not the district attorney, and his right to a speedy trial. The trial court appeared to accept defendant's position.

Regarding a misperception underlying this "speedy trial" problem, we inject that had the Attorney General *not* appealed the recusal order, he would have moved for a continuance, and it is inconceivable that such a motion would not have been granted: No trial judge could expect a prosecutor to take over a death penalty prosecution without a reasonable time to prepare. For this reason, defendant's trial would not have been as "speedy" as he seems to assume.

In any event, defendant had separately moved to dismiss the case based on outrageous government conduct, raising issues connected to the "van tape" which led to vacation of the initial conviction. After the recusal motion was granted, the trial judge reconsidered an earlier ruling and granted in part the motion to dismiss, by forbidding pursuit of the death penalty, based on his view that the People had not been "punished" enough by the California Supreme Court's decision: "That handles the legal aspect of it, but it doesn't

address or have anything to do with what I think should be a deterrent effect, a message, if you will, to prosecution teams everywhere that there is a penalty." For reasons not disclosed by the record, the People did not seek writ relief from this ruling and it is too late to grant relief now. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677].) Apart from abandoned issues relating to a supplement to the recusal motion, the motion was based on the claim that the decision to seek the death penalty was influenced by political considerations, instead of broader societal factors which normally inform a district attorney's exercise of discretion. But, as the trial judge himself assumed, the issue was trumped by the order granting in part the motion to dismiss. Defendant got what he wanted; it is the *People* who were deprived by the trial judge of an informed prosecutorial decision.

Defendant asserts: "To the extent that there were discretionary decisions to make in obtaining a conviction for murder in the first degree with special circumstances, the bias evidenced by the political campaign was indivisible in rendering a likelihood that appellant would not receive a fair trial." We agree that prosecutors exercise discretion at every stage of a case (see e.g., *People* v. *Conner, supra,* 34 Cal.3d at p. 149), but the only decision contested in the recusal motion and the hearing was the decision to seek the death penalty. No other discretionary decision was mentioned in the trial court. There was no claim that defendant may have suffered by the decision to retry him on the same charges upon which he was convicted once before. His claim was that another prosecutorial office should decide whether to seek the death penalty, which he asserted was due to Lacy's implied campaign promise. Defendant did not face the death penalty thereafter and we will not engage in a hypothetical "what if" about other less significant prosecutorial decisions which *could have been* made differently, when those decisions were never discussed below. If the deputy district attorney who actually tried the case made any particular decision which defendant thought was unfair, he has not pointed it out in his briefs.

Defendant does engage in a series of speculations to the effect that an "unbiased" prosecutor might have believed that codefendant Centers committed the crime, might have chosen not to present certain identification evidence, and so forth. Defendant then states: "If it is argued that all this is speculative,"—it is—"and that . . . it cannot be proven or demonstrated that the actual decisions were motivated by improper concerns, the answer to this is that the standard of review operative here is indeed 'informed speculation.'" In support defendant cites *People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835], which involved a defense counsel with a conflict of interest and asserts the standard "is appropriate as well when the conflict in question animates the prosecutor."

Defendant's musings are imaginative, but to no avail. "There was no evidence this case would not have been capitally charged or would otherwise have been prosecuted differently." (*People* v. *Millwee, supra*, 18 Cal.4th at p. 125.) We decline to speculate. Defendant lodged none of the objections now tendered in the trial court, where inquiry could have revealed the facts, rather than the speculations, which would "inform" us on these points.

## II.

The most dramatic moment in these proceedings provides the backdrop for defendant's next claim of error. The "van tape" to which the California Supreme Court held defendant's attorney should have interposed an objection was played at the preliminary hearing. Barbara Teater, the victim's widow, was in the audience, heard the tape, and recognized the voice.

On remand, the defense attempted to keep this evidence out but the prosecution was allowed to present the following redacted version. First, it was stipulated "that Mrs. Barbara Teater Chester heard a voice sample in April of 1982 and it is stipulated that the word 'fucking' in the sample was spoken by the defendant[.]" Then Teater testified the voice she had heard threatening to kill her husband was "very mean, nasty mean." The "voice sample" she heard sounded the same. Teater based her identification on the single word, "fucking," which was notable because of the meanness with which it had been spoken, apart from its vulgarity. She said she heard the tape six weeks after the murder. To the extent defendant implies the use of this redacted version of the facts was improper, we disagree. It merely pared the truth to its essentials. (Cf. *People* v. *Harris* (1998) 60 Cal.App.4th 727, 733 [70 Cal.Rptr.2d 689] [redaction altering facts "troubling"].)

Defendant contends this testimony was inadmissible. First, he contends relitigation of the issue was barred. Second, he contends the evidence is an excludable "fruit" of a *Massiah* violation (*Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]). We disagree with both views.

## A.

Defendant contends the California Supreme Court's decision either precluded the prosecutor from using the "van tapes," or constituted a "law of the case." But defendant's objections in the trial court embraced neither "law of the case" nor issue preclusion. These issues are waived. Objections must be timely and *specific*. (Evid. Code, § 353, subd. (a); *People* v. *Ghent* (1987) 43 Cal.3d 739, 766 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Defendant contends the doctrines are not "waived on appeal." We agree. They were waived in the trial court by defendant's failure to lodge specific objections to evidence the prosecution tendered. Although defendant points to authority that law of the case may bind an appellate court (e.g., *People* v. *Stanley* (1995) 10 Cal.4th 764, 786-787 [42 Cal.Rptr.2d 543, 897 P.2d 481]), he points to no case where such was done absent objection in the trial court. Indeed, the California Supreme Court characterizes the rule as one of mere "procedure," not jurisdiction (*Stanley, supra,* 10 Cal.4th at p. 787); thus there is no good reason why the point can be raised for the first time on a subsequent appeal. That would be unfair to the trial attorneys and trial judge, who might, if alerted to the issue, act otherwise. ■ "[A] question presented and decided by an appellate court becomes thereafter the law of the case and . . . the rule is binding on the appellate court if the case again comes before it after having gone down to the lower court for further proceedings, the facts on the second appeal being the same as on the first. The reason of the rule is apparent. This court having declared the law, and the parties and the court below having acted upon it, as a matter of policy, the law as thus declared and acted upon, whether right or wrong, cannot afterward be changed. But for this salutary rule, litigation might go on indefinitely[.]" (*Sharon* v. *Sharon* (1889) 79 Cal. 633, 654 [22 P. 26, 131].) But in many cases, as here, the facts *are not the same,* and if the point is not tendered, nobody has acted upon the supposed "law" of the case at the subsequent trial.

A similar result obtains with respect to issue preclusion. Defendant states that although a "defense" of res judicata must be raised in the trial court, collateral estoppel need not be. His cases merely show that collateral estoppel need not be *pleaded* and the root authority for his claim is *Solari* v. *Atlas-Universal Service, Inc.* (1963) 215 Cal.App.2d 587 [30 Cal.Rptr. 407], where the issue was raised by timely and specific objection to evidence. (See *id.* at p. 591.) ■ The California Supreme Court has stated, without distinguishing the doctrines, that "Where a party joins issue on a question previously litigated or voluntarily opens an investigation of matters which he might claim to be concluded by a prior judgment, he will be held to have waived his right to assert the benefit of the former adjudication and the case will be determined without regard therefor. [Citations.]" (*Dillard* v. *McKnight* (1949) 34 Cal.2d 209, 219 [209 P.2d 387, 11 A.L.R.2d 835].) In a case where a party asked that court to consider the effect of an Industrial Accident Commission decision, the court refused: "A defense founded upon the conclusiveness of a former adjudication must be either pleaded or proved. [Citations.] Such defense is waived if not raised either by the pleadings or the evidence. [Citations.]" (*Rideaux* v. *Torgrimson* (1939) 12 Cal.2d 633, 638 [86 P.2d 826].)

The rule makes sense. In a somewhat analogous situation, the rule is that a party must object at a later trial, though the objection had been overruled at an earlier trial: "A defendant may not acquiesce in the admission of possibly excludable evidence and then claim on appeal that rulings made in a prior proceeding render objection unnecessary. In the absence of an objection there was no error in admitting the evidence and no issue cognizable on appeal as to the propriety of its admission." (*People* v. *Clark* (1990) 50 Cal.3d 583, 624 [268 Cal.Rptr. 399, 789 P.2d 127].) So, too, here.

██ Defendant claims we must address the issues on the merits because the failure of defense counsel to tender these objections constituted ineffective assistance of counsel. Whether to object to testimony and on what grounds are generally tactical matters. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].) Unlike an appellate attorney, who has the luxury of leisurely picking through the carcass of the record, a trial attorney must often act on his feet, with only his experience and instinct to guide him. (See *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1000-1003 [118 Cal.Rptr. 391].) Assuming defendant could establish there is no conceivable tactical reason for counsel's decision not to raise these objections, we would point out that the California Supreme Court did not decide whether the van tape could be used as an *exemplar*, nor that a subsequent identification derived therefrom would be subject to exclusion. That court did mention the voice identification by Teater (*In re Neely*, *supra*, 6 Cal.4th at p. 921), and appellate counsel herein asserts it would not have done so unless it were inadmissible. In its assessment of prejudice, the court held the tape's *content* was the "centerpiece" of the case, not that the Teater identification was inadmissible. Nowhere in its decisions did the court discuss the "fruits" doctrine or state that the voice identification was inadmissible. ██ "A decision is not even authority except upon the point actually passed upon by the Court and directly involved in the case." (*Hart* v. *Burnett* (1860) 15 Cal. 530, 598.) ██ Indeed, defendant claims that the issue must have been decided because it was briefed before the California Supreme Court, but this fact cuts against defendant. If the issue was important to the decision and briefed by the parties, the court would have addressed it explicitly. At best, because the court mentioned the identification in weighing prejudice, it might be thought that the court assumed, without deciding, that the evidence was a fruit, but chose not to *decide* the issue. Neither the "law of the case" nor collateral estoppel doctrines extend to *dicta*. (*Wixson* v. *Devine* (1889) 80 Cal. 385, 388 [22 P. 224].) Trial counsel's implicit determination that these objections were not worth making was within his tactical discretion.

## B.

### i.

■ Defendant claims the Teater identification was an *unattenuated* "fruit" of the *Massiah* violation. We disagree.

There are two aspects of the "attenuation" doctrine, which plumb the same line but approach it from different directions. One can look to the nature of the illegal conduct triggering an exclusionary rule, and determine whether exclusion of the derivative evidence would further the deterrent purpose of the rule. Or, one can determine whether the authorities obtained the derivative evidence in furtherance of the illegal conduct. In this case these paths lead to the same conclusion.

■ First, a word about *Massiah*: "The text of the [Sixth] Amendment provides in pertinent part that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' The essence of this right, we recognized in *Powell* v. *Alabama* [(1932) 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158]], is the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial. [Citation.] More recently, in a line of cases beginning with [*Massiah*], and extending through *Maine* v. *Moulton* [(1985) 474 U.S. 159 [106 S.Ct. 477, 88 L.Ed.2d 481]], the Court has held that once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel. [Citations.]" (*Michigan* v. *Harvey* (1990) 494 U.S. 344, 348 [108 L.Ed.2d 293, 301, 110 S.Ct. 1176, 1179]; see *In re Wilson* (1992) 3 Cal.4th 945, 950-951 [13 Cal.Rptr.2d 269, 838 P.2d 1222].)

■ The California Supreme Court necessarily determined the van tape was inadmissible because the statements were elicited in violation of defendant's right to counsel, as interpreted by *Massiah*. We must apply the " 'fruit of the poisonous tree' " analysis to this violation (*Nix* v. *Williams* (1984) 467 U.S. 431, 441-442 [104 S.Ct. 2501, 2507-2508, 81 L.Ed.2d 377, 385-387]), and determine " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint,' " or " 'so attenuated as to dissipate the taint.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455]; see *U.S.* v. *Kimball* (9th Cir. 1989) 884 F.2d 1274, 1279.)

■ A "fruit" may be admitted if there was an independent source for it; it would have been found anyway; or the path from the illegality to the "fruit" is too "attenuated." (*People* v. *Thierry* (1998) 64 Cal.App.4th 176, 180 [75 Cal.Rptr.2d 141].) The "attenuation" branch of the poisonous tree doctrine stems from *Nardone* v. *United States* (1939) 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307]. A federal statute called for the exclusion of intercepted telephone conversations, and the court concluded the statute should be construed to exclude evidence derived from those conversations. But, "[s]ophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." (*Id.* at p. 341 [60 S.Ct. at p. 268, 84 L.Ed. at p. 312].)

Of necessity, the "attenuation" analysis is fact dependent. As Justice Scalia explained, "attenuation" of taint is not really an exception to the exclusionary rule; *lack* of attenuation is an element of the rule: "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, [citation], and of testimony concerning knowledge acquired during an unlawful search, [citation]. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint,' [citations]." (*Murray* v. *United States* (1988) 487 U.S. 533, 536-537 [108 S.Ct. 2529, 2533, 101 L.Ed.2d 472, 480].) Defendant has the burden "to establish cause and effect, showing an exploitative nexus, between the challenged evidence and the primary illegality." (*People* v. *Cella* (1983) 139 Cal.App.3d 391, 400 [188 Cal.Rptr. 675].)

"[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." (*Kuhlmann* v. *Wilson* (1986) 477 U.S. 436, 459 [106 S.Ct. 2616, 2630, 91 L.Ed.2d 364, 384].) These cases further the Sixth Amendment interest in preserving "the integrity of an accused's choice to communicate with police only through counsel." (*Patterson* v. *Illinois* (1988) 487 U.S. 285, 291 [108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 271].) "By requiring that confessions be suppressed when obtained after the right to counsel has attached, but outside the presence of counsel, the Supreme Court sought to strengthen the relationship between the attorney and his client and protect that relationship from government interference." (3 Ringel, Searches & Seizures, Arrests and Confessions (2d ed. 1999) Sixth Amendment Aspects of Confessions and Admissions, § 29.1, p. 29:1.) Thus, the crux of a *Massiah*

"taint" analysis is whether the *content* of the admissions was exploited. For it is the lawyer's ability to advise on and to some degree control the content of his client's communication with the police that is the essence of the "assistance of counsel" in this context. (E.g., *Brewer* v. *Williams* (1977) 430 U.S. 387, 399 [97 S.Ct. 1232, 1239-1240, 51 L.Ed.2d 424, 436-437]; *U.S.* v. *Kimball, supra,* 884 F.2d at pp. 1278-1278.) ▇▇▇ As will be demonstrated, the voice identification evidence, although a "but-for" product of the interference with defendant's Sixth Amendment rights, was not derived "by exploitation of that illegality[.]" Defendant has not carried his burden to show that the identification and the unlawful interrogation have any "exploitative" connection.

The United States Supreme Court, after quoting Justice Frankfurter's opinion in *Nardone,* quoted in part above, explained that the attenuation question "cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements as well." (*United States* v. *Ceccolini* (1978) 435 U.S. 268, 274 [98 S.Ct. 1054, 1059, 55 L.Ed.2d 268, 276].) It is wrong to conclude "that if the road were uninterrupted, its length was immaterial." (*Id.* at p. 275 [98 S.Ct. at p. 1059, 55 L.Ed.2d at p. 276].) Instead, because the exclusionary rule exacts a toll on society, its *deterrent purpose*, if any, must guide the analysis. "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." (*Id.* at p. 279 [98 S.Ct. at pp. 1061-1062, 55 L.Ed.2d at p. 279].)

Here, in addition to exclusion of the incriminating statements mandated by the California Supreme Court decision, the trial court, in an extraordinary move, decided that that decision did not "punish" the People enough, and forbade them from seeking the death penalty. Not only have the People been deprived of the direct fruits of the misconduct of the officers, they have been deprived of the possibility of a lawful punishment for this crime which the jury might have found warranted by the facts. In this circumstance, further extension of the exclusionary rule would have no additional deterrent effect: An officer who would risk repetition of the improper conduct herein would do so in any circumstances; diligent officers would already be deterred from repetition of such conduct. (See *United States* v. *Ceccolini, supra,* 435 U.S. at p. 281 [98 S.Ct. at p. 1063, 55 L.Ed.2d at p. 280] (conc. opn. of Burger, C. J.) ["the appropriate inquiry . . . is whether official conduct in reality will be measurably altered by" exclusion]; *State* v. *Maier* (Fla.Dist.Ct.App. 1979) 378 So.2d 1288, 1291 [officers who committed illegal act "will not be rendered any less likely to do it again by their knowledge of such a result," rejecting exclusion of derivative identification evidence].)

This last point is amplified by *Michigan* v. *Tucker* (1974) 417 U.S. 433 [94 S.Ct. 2357, 41 L.Ed.2d 182], where the question was whether the

testimony of a witness disclosed by a *Miranda* violation should be excluded. The court stated: "[W]e find the arguments in favor of admitting the testimony quite strong. For, when balancing the interests involved, we must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. In this particular case we also 'must consider society's interest in the effective prosecution of criminals . . . .' [Citation.] These interests may be outweighed by the need to provide an effective sanction to a constitutional right [citation], but they must in any event be valued." (*Id.* at pp. 450-451 [94 S.Ct. at p. 2367, 41 L.Ed.2d at pp. 196-197.)

As a corollary, the desire to punish and deter misconduct by government agents must not be *over*valued. (See *Michigan* v. *Harvey* (1990) 494 U.S. 344, 351-352 [110 S.Ct. 1176, 1181, 108 L.Ed.2d 293, 303] [Which involved the use of an impeaching statement taken in violation of the Sixth Amendment. The court stated that in cases involving prophylactic rules, "we have decided that the 'search for truth in a criminal case' outweighs the 'speculative possibility' that exclusion of evidence might deter future violations of rules not compelled directly by the Constitution."]; *Murray* v. *United States, supra,* 487 U.S. at pp. 539-541 [108 S.Ct. at pp. 2534-2535, 101 L.Ed.2d at pp. 482-483]; *id.* at p. 544 [108 S.Ct. at p. 2537, 101 L.Ed.2d at p. 485] ](dis. opn. of Marshall, J.) ["The Court has crafted exceptions to the exclusionary rule when the purposes of the rule are not furthered by the exclusion."]; *United States* v. *Havens* (1980) 446 U.S. 620, 627 [100 S.Ct. 1912, 1917, 64 L.Ed.2d 559, 566] [incremental deterrence "insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial"]; *United States* v. *Morrison* (1981) 449 U.S. 361, 364 [101 S.Ct. 665, 667-668, 66 L.Ed.2d 564, 568] ["[W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."].)

Thus, where the "incremental" deterrent effect is unclear, the exclusionary rule will not be applied. (See *Stone* v. *Powell* (1976) 428 U.S. 465, 486-487 [96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067, 1083-1085] ["As in the case of any remedial device, 'the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.' "]; *Brown* v. *Illinois* (1975) 422 U.S. 590, 609 [95 S.Ct. 2254, 2264, 45 L.Ed.2d 416, 430] (conc. opn. of Powell and Rehnquist, JJ.) [" 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of

illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."].)

Viewed from this perspective, given that the exclusion would do nothing to deter misconduct because the punishment already imposed on the authorities (and on the public at large) has been severe, exclusion seems unwarranted. This conclusion is confirmed when the causal connection between the illegality and the derivative evidence is examined carefully.

In this regard, defendant views *People* v. *Teresinski* (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753] (*Teresinski*), and *United States* v. *Crews* (1980) 445 U.S. 463 [100 S.Ct. 1244, 63 L.Ed.2d 537] (*Crews*), to be dispositive authority in his favor. The difference between those cases and this one plumbs the line of "exploitation." In *Teresinski* and *Crews*, the authorities committed some illegality which resulted in a photograph of the accused; the photograph was used to obtain out-of-court identifications from a witness; the witness also identified the accused in court. The courts in each case held the photographs and pretrial identifications were obtained by exploitation of the illegality and should be suppressed. The courts also held the in-court identifications should not be suppressed—a point not presented here, since Teater made no in-court identification.

Defendant plausibly likens the tape to a photograph, but then reasons Teater's hearing of the tape is like a witness identifying a photograph, and urges that application of *Teresinski, supra,* 30 Cal.3d 822, and *Crews, supra,* 445 U.S. 463 [100 S.Ct. 1244, 63 L.Ed.2d 537] requires suppression of her pretrial identification of his voice.

We cannot agree. To "exploit" is to work, to mine, to make capital of. (Oxford English Dict. (2d ed. CD-ROM).) Exploitation requires intention. One works or mines to achieve some object and expects, or at least hopes for, a payoff.

In *Teresinski* and *Crews*, the photographs were shown to witnesses *for the purpose of* securing an identification. (*Teresinski, supra,* 30 Cal.3d at p. 832; *Crews, supra,* 445 U.S. at p. 467 [100 S.Ct. at pp. 1247-1248, 63 L.Ed.2d at p. 543.) The authorities in each case "exploited" the tainted photograph— they used it to further the investigation with the intent of learning whether the witness could identify the accused. Here, it is undisputed that the authorities came by the voice identification evidence wholly by accident. Indeed, the trial court found—after taking evidence on the point—that no voice lineup was contemplated, that this evidence would not have been "inevitably discovered." There was no intention of acquiring an identification by playing the tape; it was dumb luck, one of the vicissitudes of trial practice.

Defendant contends the authorities "exploited" the tape because they played it in the course of prosecuting the case, in aid of establishing probable cause at the preliminary hearing. But they had no intention of deriving further *evidence* from the tape. (Cf. *Gilbert* v. *California* (1967) 388 U.S. 263, 271-272 [87 S.Ct. 1951, 1955-1956, 18 L.Ed.2d 1178, 1186] [testimony by witnesses that they identified Gilbert at illegal pretrial lineup—done for the purpose of obtaining an identification—inadmissible].) Certainly, had they not played the tape, the identification would not have been made. Such but-for causation does not suffice. The prosecution did not intentionally "create its own luck," as defendant states. Contrary to defendant's views, the "heart of the matter" *is* whether the voice identification was an intended or hoped-for product of the *Massiah* violation, and it is *not* "sufficient that [the tape] was obtained for whatever evidentiary advantage it might possibly yield." Such a rule is, in reality, a "but-for" causation test.

We concede that an illegal act by a peace officer may yield *unexpected* evidence subject to exclusion. Illegal entry into a bordello may reveal a narcotics laboratory, or beating a rape suspect may yield a confession to murder, all quite unexpectedly. But in such examples, there is present an intention *to get something*. Not so here.

This result accords neatly with the rationale supporting the exclusionary rule discussed above: deterrence. Deterrence acts against a will and implies that there is a being capable of choosing one of several courses of action. Where evidence appears by happenstance—where it could not have been contemplated as part of the illegality—no deterrent rule will have any effect on the conduct of officers. (*People* v. *McInnis* (1972) 6 Cal.3d 821, 826 [100 Cal.Rptr. 618, 494 P.2d 690] ["the circumstances under which this particular photograph was exhibited were essentially fortuitous"]; *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 171 [89 Cal.Rptr. 731, 474 P.2d 683] ["search was not directed toward the discovery of witnesses . . . it was pure happenstance[;]" exclusion would not deter misconduct]; *People* v. *Griffin* (1976) 59 Cal.App.3d 532, 537-538 [130 Cal.Rptr. 648] [" '[P]ure happenstance' . . . means a chance disclosure absent 'the exploitation of illegal police conduct.' "]; see *Nicholson* v. *State* (Miss. 1988) 523 So.2d 68, 73 [victim overheard suspect at police station and identified voice; "in the absence of any evidence that this incident was staged, Nicholson's Sixth Amendment right to counsel was not violated"]; cf. *People* v. *Rodriguez* (1993) 21 Cal.App.4th 232, 241 [26 Cal.Rptr.2d 660] [photograph taken "for use in future criminal investigations, and the connection between it and the identification of Rodriguez was not happenstance."].)

The *Massiah* rule forbids the use of illegally elicited incriminating statements. No such statements were used at trial, nor was the *content* of those

statements a factor in Teater's identification. She did not base her identification on the content of defendant's speech; she based it on the way he said "fucking." (See *Gilbert* v. *California, supra*, 388 U.S. at p. 267 [87 S.Ct. at p. 1953, 18 L.Ed.2d at p. 1183] ["[n]o claim is made that the content of the exemplars was testimonial"].) The People discovered evidence of an aural identification which, *but for* the illegality, they would not have discovered. But the discovery was not an exploitation of the *Massiah* violation and could not have been within the contemplation of the officers who committed that violation.

Further, the authorities had the right to record conversations in the van and there is nothing illegal about using the sound of an accused's *voice* as evidence. A person has no general right to suppress the sound of his voice. The rule was most ably put by Justice Holmes: "A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." (*Holt* v. *United States* (1910) 218 U.S. 245, 252-253 [31 S.Ct. 2, 6, 54 L.Ed. 1021, 1030], approved *Pennsylvania* v. *Muniz* (1990) 496 U.S. 582, 591 [110 S.Ct. 2638, 2644-2655, 110 L.Ed.2d 528, 545] (maj. opn. of Brennan, J.); *id.* at p. 607 [110 S.Ct. at p. 2653, 110 L.Ed.2d at pp. 555-556] (conc. & dis. opn. of Rehnquist, C. J.).) Accordingly, the prosecution is entitled to demand a voice exemplar when relevant, such as where a witness has heard a voice during the crime. (*People* v. *Ellis* (1966) 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393]; see *Garcia* v. *Superior Court* (1991) 1 Cal.App.4th 979 [2 Cal.Rptr.2d 707] [defense may compel voice lineup when material].)

As the Attorney General points out: "The constitutional error lies in the interrogation on the tape, its substantive contents—not the voices on the tape itself." (Accord, *Brown* v. *Harris* (2d Cir. 1981) 666 F.2d 782, 785 [officers who illegally interrogated suspect allowed to identify his voice].) The *taping* of the conversation was not illegal, only the elicitation of content. The identification came by the physical act of playing the *tape*, not "exploitation *of the illegality*."

The purpose and flagrancy of the misconduct is also a factor in "attenuation" analysis. (See *Brown* v. *Illinois, supra*, 422 U.S. at pp. 610-612 [95 S.Ct. at pp. 2265-2266, 45 L.Ed.2d at pp. 431-432] (conc. opn. of Powell and Rehnquist, JJ.) [distinguishing "flagrantly abusive" Fourth Amendment

violations from those which are but "technical"].) Here, the *Massiah* violation was relatively mild. Although the conduct was illegal, in the broad spectrum of Sixth Amendment violations, it was not flagrant. It consisted solely in inducing *voluntarily spoken* pretrial admissions, and would have been legal had Centers possessed the ability to follow directions and not ask the defendant questions.

There was no connection, except a "but for" connection, between the illegal conduct of the peace officers in obtaining the statements recorded on the tape and the fortuitous playing of the tape at the preliminary hearing in Teater's presence.

Because the evidence was not "come at by exploitation" of the *Massiah* violation, it is not a suppressible fruit thereof. (*Wong Sun* v. *United States, supra,* 371 U.S. at pp. 487-488 [83 S.Ct. at pp. 417-418, 9 L.Ed.2d at p. 455].)

### ii.

■ Were our conclusion as to lack of exploitation different, defendant has still failed to show prejudice.

(12) The harmless error test of *Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], applies to *Massiah* violations. "In reviewing *Massiah* error, 'We need not determine whether the jury in fact relied on the tainted evidence in reaching a verdict. We need only conclude that "it is clear beyond a reasonable doubt that if the jury had not considered" the tainted evidence "its verdict would have been the same." ' [Citations.]" (*People* v. *Catelli* (1991) 227 Cal.App.3d 1434, 1445 [278 Cal.Rptr. 452].)

■ Defendant's argument for prejudice focuses, appropriately, on the star witness, Malcolm Centers, who was severely impeached at trial, due to his drug usage and sales and motive to lie.

The Attorney General surmises—without dispute by defendant—that the jury based liability on an aider theory. Inasmuch as the jury found the murder occurred during the course of felonies, yet found personal firearm use enhancements were *not true,* we agree. As to aider liability, the evidence—apart from the Centers testimony—was overwhelming.

Defendant's wife's truck was found at the scene, loaded with evidence, including a suitcase which contained defendant's clothes and a clip which fit

a High Standard pistol. All three original defendants were seen together at the restaurant on the morning of the murder. Defendant had worked for the victim. Most importantly, *defendant hid out near the murder scene for three days*, during which time he stole clothes and broke into a vacant home; when arrested, he had $1,254 on his person.

No plausible explanation for why defendant hid out in the brush or in the vacant home near the murder scene for three days is tendered on appeal. Defense counsel asserts defendant may have been off making drug deals, but that does not explain why he was stealing clothes and hiding out near the murder scene for days after the crime.

Further, from Centers's girlfriend, Coe, we learn that defendant spoke of his gun jamming. Three bullets were fired at the scene, but only two shells were ejected; an expert explained that when a semiautomatic pistol jams, the shell may not eject. Coe heard discussions about a floor safe and tying a woman up, saw handcuffs and saw defendant with a gun which could have been a High Standard .22-caliber. At the Chester home there *was* a floor safe, Chester *was* handcuffed, and a clip for a High Standard pistol was found with *defendant's* clothes at the scene, in a suitcase in a truck registered to defendant's wife. Coe also connected the plan to DeArkland, which corroborates the tale told by Centers. That tale, if believed in almost any particular, thoroughly implicated defendant as an aider, if not as the shooter.

Finally, the allegedly tainted evidence—the aural identification by Teater —was not strong. As defendant notes elsewhere, "Her identification rested on the delicate footing of a single word uttered in a certain tone." In addition to extensive expert analysis of and attack on the circumstance of the identification, the jury knew it was based on a single spoken word and was based on the *tone* of that word. It is unlikely that the jury paid much attention to this evidence, despite all the ado caused by the competing expert witnesses about its reliability, *vel non*.

If the evidence should not have come in, the error was harmless beyond a reasonable doubt.

### III.-IX.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The recusal order is vacated with directions to enter an order denying defendant's recusal motion. The judgment is modified by reducing the

*See footnote, *ante*, page 767.

restitution fine to $10,000 and is otherwise affirmed. The trial court is directed to forward to the Department of Corrections a new abstract of judgment.

Blease, Acting P. J., and Raye, J., concurred.

Petitions for a rehearing were denied April 8, 1999, and the opinion was modified to read as printed above. The petition of appellant Charles Frederick Neely for reiew by the Supreme Court was denied June 23, 1999.